113 N.J. Super. 279 (1971)
273 A.2d 606
STEVEN E. SABLOFF, AN INFANT BY HIS GUARDIAN AD LITEM HERBERT SABLOFF, AND HERBERT SABLOFF, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
YAMAHA MOTOR CO., LTD., YAMAHA INTERNATIONAL CORPORATION, A CORPORATION AND HARLEY-DAVIDSON OF ESSEX, A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1971.
Decided February 3, 1971.
*280 Before Judges KILKENNY, HALPERN and LANE.
Mr. Leonard J. Felzenberg argued the cause for appellants (Messrs. Roskein, Kronisch & Felzenberg, attorneys).
Mr. Daniel K. Van Dorn argued the cause for respondents Yamaha Motor Co., Ltd., and Yamaha International Corporation (Messrs. Gleeson, Hansen & Pantages, attorneys).
*281 Mr. Guy H. Haskins argued the cause for respondent Harley-Davidson of Essex (Messrs. Haskins, Robottom & Hack, attorneys).
The opinion of the court was delivered by KILKENNY, P.J.A.D.
This is a products liability case involving a Yamaha motorcycle, in the operation of which the infant plaintiff was injured. The suit is against the manufacturer, the importer and the dealer which ultimately sold the cycle to plaintiff. Liability is asserted on the theories of negligence, strict liability in tort and breach of warranty. Plaintiff father joined in the action for his damages per quod.
At the close of all the proofs, on motion of defendants under R. 4:40-1, judgment was entered by the trial judge in favor of all defendants. On their appeal from that judgment, plaintiffs argue that (1) it was error to take the case from the jury, and (2) the trial court erred in excluding certain evidence.

I
In passing upon a defendant's motion for judgment in his favor, made at the close of all the proofs under R. 4:40-1, the test to be applied by the trial judge is whether the evidence, together with the legitimate inferences therefrom, could sustain a judgment in favor of the plaintiff. If, accepting as true all the evidence which supports the position of the party opposing the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5 (1969).
So guided, we note that infant plaintiff Steven E. Sabloff purchased the subject motorcycle, an 80 C.C. Yamaha motorcycle, from defendant Harley-Davidson of Essex on Friday, August 13, 1965, two days before he became 18 years old. The cycle had been operated only 56 miles, purportedly, at the time of purchase, and Mr. Steele, the seller's president, *282 gave Steven, the purchaser, a "new bike" warranty. Steven drove the motorcycle home that day, experiencing only a little stalling problem which quickly cleared up.
Steven had motorcycle experience prior to the purchase of this machine. In the summer of 1964 he learned how to ride and operate a motorcycle by using a friend's Honda on farm property in Livingston, operating it on the farm about three days a month throughout a whole year and thereby becoming "able to handle the motorcycle pretty well." About the end of July 1965 Steven purchased his own motorcycle, a Yamaha 55 C.C., and experienced no difficulty in operating it without any accident or trouble. But the need for routine servicing led him to defendant dealer's shop and the purchase of the motorcycle in issue, the Yamaha 80 C.C. He had a "learner's permit" at the time of this purchase.
On Saturday, the day after the purchase, plaintiff rode the motorcycle another 50 miles and had no trouble with it.
On the following Sunday evening plaintiff drove around the area, stopping at a friend's house, at Livingston Center and at Livingston High School. At about 8:50 P.M., on this August 15, 1965 Sunday, plaintiff and Larry Bagoon, a licensed driver who was on his own motorcycle, rode out Memorial Park Drive and then right on South Livingston Avenue. This blacktopped road was dry and traffic was light. The weather was clear. Steven testified that he was feeling fine. They were travelling at about 25 miles an hour, with Larry about 15 feet behind plaintiff. Suddenly, the front wheel of the motorcycle stopped turning, the cycle went out of control, veered to the right and skidded about 10 or 15 feet before crashing into a parked car, causing injury to plaintiff. Steven testified that he had not touched the brake and had no reason for wanting to stop.
Thomas J. Nolan, Jr., a Livingston police officer at the time of the accident, testified that he was in a police patrol car and came to the scene of the accident at 9:13 P.M., "within a minute or two, possibly," after it had occurred. He found plaintiff on the street pavement and asked him *283 what had happened. Plaintiff told him "they were doing approximately 25 to 30 miles an hour and the front wheel, the front tire of the motorcycle apparently locked on him and he struck  he lost control of the motorcycle and struck a parked car." The motorcycle was in the street at the scene of the accident and unchanged between the time of the accident and the time the officer saw it. The officer "noticed that the front fender (of the motorcycle) had a dent in it and that the front wheel would not move, as I was told by Mr. Sabloff." (Emphasis added). The officer explained that he meant, the front wheel "would not rotate." He saw nothing that was preventing it from rotating, "such as a spoke broken or a fender or anything like that." He observed that the hand brake had the lever "in the raised position, that is disengaged." The officer stated that the speed limit in that area was 40 miles an hour. The officer observed no skid marks on the highway.
Larry Bagoon's deposition was read, since he was unavailable. He confirmed that the wheel would not rotate. So, too, did Jeffrey Sabloff, plaintiff's brother, who examined the motorcycle later that night.
Jesse Fisher testified as an expert witness on behalf of plaintiffs. Although his qualifications as an auto repair man showed a marked absence of expertise as far as motorcycles were concerned, the trial judge permitted him to testify to his opinion, "based on whatever factual data may be supplied to him." The trial judge remarked, however, "the probative value I will leave for the jury." (Granting defendants' motions prevented the jury's appraising the "probative value" of Fisher's expert testimony.)
Fisher had no opportunity to see the wheel while it was still on the motorcycle. When he observed it, the wheel had been removed from the fork, thus preventing his determining "the side play that this wheel had at the time of the accident." Fisher testified as to this aspect, "If it had excessive side play prior to the accident, it could have locked the wheel by twisting and forcing the brake to become applied."
*284 Fisher actually reassembled the brake assembly in his laboratory. He testified:
I found the brake was working properly. I found nothing wrong with it. The axle, which is slightly bent, I noted, but it didn't affect the brake operation and it was safe to assume, I felt, at that time and I still do, that that bend in the axle was a result of the accident, and it did not affect the braking of the front wheel.
When Fisher was asked in a hypothetical question as to what could have caused the accident, he stated that it could have been a driving error, namely, in activating the brakes, or it could have been a mechanical error, "excessive side play prior to the accident * * * could have locked the wheel by twisting and forcing the brake to become applied." He claimed that a factor which could bring about such side play might be the tightness of the nuts on the axle bolt.
The difficulty with Fisher's expert opinion testimony was in its being based upon two possible theories of causation, viz., (1) the human factor in activating the brakes, and (2) the mechanical error in too much "side play due to improper tightening of the nut." There was no direct proof of "excessive side play" prior to the accident, which "could have locked the wheel." There was no direct proof of any "inadequate tightness of the nuts on the axle bolt" which could have brought about such excessive side play.
We pause here to note that the motorcycle wheel, as such, comes fully assembled to the dealer and the latter's function is to attach the wheel to the fork by inserting the axle bolt through an opening in the wheel and screwing on a nut at the end of the bolt. A demonstration of that simple operation by the dealer was made before us at oral argument. It involves no complicated performance.
Steele, defendant seller's president, testified that he had originally assembled the cycle. He referred to no manufacturer's manual in doing so. He stated that there was none then available to the best of his knowledge. Steele relied only on his 25 years of experience in tightening nuts. He *285 stated that he tightened this particular nut "so that it cannot come loose by itself and can only be taken off by a wrench." Steele testified that the tolerance in the side play was less than the 3 mm. recommended by the manufacturer as a side play limit at the wheel rim, according to a manual put out by Yamaha subsequent to the accident, and identified by Fisher. Steele had also road-tested the motorcycle before its delivery to plaintiff and had found no difficulty with it.
Leo C. Lake, service manager for Yamaha International, testified as an expert witness for defendant. He had contributed to the manual referred to above. He stated that the 3 mm. test was intended to deal with limits of wear and not in original wheel assembly. He also said that the tightening of the nuts has nothing to do with side play. They should be wrench-tight. It was his opinion that if, under the circumstances of this case, the wheel had locked, the motorcycle would have fallen immediately and not skid any considerable distance.
Gordon Jennings, former editor of Cycle magazine and present editor of Car and Driver, testified as an expert for defendants. He had examined the motorcycle and had reassembled the wheel. He testified that the only way in which the wheel could have involuntarily locked would have been if a lug broke or there was other damage which pulled on the brake. This did not occur. He confirmed Lake's opinion that, if the wheel had locked, the motorcycle would have fallen immediately. Jennings added his opinion that the front tire had not been involved in a skid.
During the course of Fisher's testimony, the Yamaha manual was offered in evidence, but admission was not allowed by the trial judge.

A. AS TO DEFENDANT HARLEY-DAVIDSON OF ESSEX
Accepting as true all the evidence which supports the position of plaintiffs and according them the benefit of all inferences which can reasonably and legitimately be deduced *286 therefrom, reasonable minds could differ as to the liability of Harley-Davidson of Essex, the dealer which sold this Yamaha motorcycle to the infant plaintiff.
The motorcycle had been sold under a "new bike" warranty in assembled form. There was additionally the implied warranty of merchantability, of fitness for use as a motorcycle. Plaintiff had made no adjustment to the motorcycle between the time of purchase on Friday and the accident on Sunday, two days later.
A motorcycle whose front wheel stops rotating while being operated by an experienced cyclist at 25 miles an hour along a paved public highway, without any brake being applied or any other cause for the stoppage attributable to the driver or some third person, is not as warranted. Common sense dictates the conclusion that wheels are placed on a motorcycle to rotate when the cycle is in operation along the highway, unless the rotation of the wheel is stopped by the application of some brake power, by the non-use of motor fuel, by driving the cycle into some fixed object, or by some such non-mechanical failure.
It was for the jury to decide whether it believed plaintiff's version of the happening  that the front wheel of this motorcycle suddenly stopped rotating, when he had not applied any brake power and had no reason for doing so and none of the other non-mechanical possibilities existed therefor.
A jury could have found credence in plaintiff's version from the testimony of police officer Nolan, who arrived upon the scene within a minute or two after the accident and confirmed by his own observation that "the front wheel would not move as I was told by Mr. Sabloff." The officer saw nothing that was preventing the rotation and noted that the brake had been "disengaged." Further confirmation that "the wheel would not rotate" could have been found in Larry Bagoon's sworn statement and the testimony of plaintiff's brother Jeffrey.
Since plaintiff's expert had advanced the two possible causes for the stoppage of the wheel's rotation and testimony *287 on behalf of plaintiff had negated the one, the jury could have reasonably found the other reason  improper tightening of the nut at the end of the axle bolt  the cause of the wheel's locking and failure to rotate. True, Steele had testified that he had made the attached nut "wrench-tight," based on 25 years' experience in tightening nuts, although he knew of no manufacturer's manual at that time limiting tolerance in the tightening to 3 mm. But his credibility was also a matter for jury determination, as was the plaintiff's recital.
We appreciate that defendant expert witnesses had offered opinions contradictory of that expressed by plaintiff's expert, as summarized above. But these conflicts were for the jury to resolve.
New Jersey has adopted the more liberal and more modern view of finding liability in favor of a purchaser of a mass-produced article who is injured in its use, finding it unnecessary any longer to prove negligence, and unnecessary to establish privity of contract, and invoking the concept of breach of warranty. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960). The purpose of the present view is to shift the burden of accidental injury caused by products sold in the stream of everyday commerce upon those who market them, who owe a duty to the public who purchase these products. Restatement, Torts 2d, § 402A, comment (c) (1965).
We realize that a plaintiff must present proof "heavier than mere surmise or conjecture." Jakubowski v. Minnesota Mining and Mfg. Co., 42 N.J. 177, 182 (1964). In that case plaintiff had introduced no evidence from which it could reasonably have been inferred that more probably than not the cause of the break was one for which the defendant was responsible. (At 186).
But more appropriate under the evidence herein is the rule laid down in Smith v. Frontier, Inc., 53 Wash.2d 805, 337 P.2d 299 (Wash. Sup. Ct. 1959), in which the purchaser *288 of a recapped tire was awarded a judgment against the seller for damages resulting from an automobile accident caused by failure of the tire due to separation of the bond of the manufacturer's original rubber from the carcass. There were two possible causes of the separation, viz., (1) excessive heat due to the tire being run under-inflated at high speeds, or (2) the bond was defective prior to recapping, was further weakened by the recapping process, and finally separated because of the heat generated during normal driving. The court concluded:
The record adequately supports a finding by the jury that not only were the road conditions and the driving normal, but also that the tire was not underinflated. This leaves the second cause of the separation available to the jury without recourse to speculation. [at 301]
So is it in the instant case. Plaintiff's expert gave two possible causes of the front wheel's failure to rotate. Plaintiff's testimony negated the one  error on the part of plaintiff in activating the brake. This left the second cause  improper tightening of the nut at the end of the axle bolt, thereby producing excessive side play and locking of the wheel  "available to the jury without recourse to speculation," as noted in Smith, supra.
We conclude as to Harley-Davidson of Essex, that the evidence at the close of all the proofs required submission of the case to the jury as to its liability. There were factual issues, requiring the jury's appraisal of the credibility of the witnesses and the conflicts in the opinions expressed by the expert witnesses. It is always a better practice to submit close questions of fact to the trier of the facts, reserving the motion for judgment n.o.v. until after verdict rendered, especially where credibility is the fulcrum upon which the issue turns. The granting of that defendant's motion for judgment under R. 4:40-1 was erroneous and requires a remand for a new trial as to its liability.

*289 B. AS TO DEFENDANTS YAMAHA MOTOR CO., LTD., AND ITS AUXILIARY CORPORATION.
Plaintiff's expert, Fisher, took the front wheel of the subject Yamaha motorcycle to his own shop and, referring to a Yahama service manual, reassembled the parts. He found nothing wrong with the brake. It worked properly. He found no defect in any of the components manufactured by this defendant. Upon reassembly, everything was in good order, as noted in the quotation from his testimony, supra.
A "probable cause" of malfunction in the wheel was ascribed by Fisher to "excessive side play" which could have locked the wheel by twisting and forcing the brake to become applied. He asserted that too much side play would, in the absence of his finding of a defective component, be probably "due to improper tightening of the nut."
The tightening of the nut on the end of the axle bolt was done by Steele, president of the dealer, as noted above. If the jury should find upon a retrial of this action that the nut was improperly tightened by Steele, thereby causing excessive side play and the locking of the wheel, would Yamaha, the manufacturer, be liable to the purchaser because of its having delegated this partial assembly function to the dealer?
When a motorcycle, such as that involved herein, is received by Harley-Davidson from Yamaha, the handlebars are removed, the controls are disconnected from the handlebars, and the front wheel, front fender, seat and tail light are removed. The assembly is made by the dealer and the motorcycle is shown and sold to the purchaser in its assembled form.
A manufacturer should not escape responsibility for breach of its warranty of fitness for purpose, when the breach is caused by an act of improper assembly  the assembly having been entrusted by the manufacturer to an authorized dealer, rather than to some employee of the manufacturer. It would be unrealistic to treat a motorcycle manufacturer *290 as a mere purveyor of motorcycle non-assembled parts and relieve it from the warranty of merchantability simply because there is no showing of a defective component part.
In Vandermark v. Ford Motor Company, 61 Cal.2d 256, 37 Cal. Rptr. 896, 391 P.2d 168 (Cal. Sup. Ct. 1964), it was held that an automobile manufacturer, which did not deliver its automobiles to the dealers ready to be driven away by the ultimate purchasers but relied on the dealers to make final inspections, corrections and adjustments necessary to make the automobiles ready for use, could not escape liability for a defect in the automobile on the ground that it may have been caused by something that an authorized dealer did or failed to do. As the court expressed it:
* * * as the manufacturer of the completed product cannot delegate its duty to have its cars delivered to the ultimate consumer free from dangerous defects, it cannot escape liability on the ground that the defect in Vandermark's car may have been caused by something one of its authorized dealers did or failed to do. [37 Cal. Rptr. at 899, 391 P.2d at 171]
Vandermark also was concerned with whether a brake system had been properly installed and adjusted before the accident.
So, here, where Yamaha did not deliver its motorcycles to its dealer ready to be driven away by the ultimate purchasers but relied on the dealer to put into assembly the non-assembled parts and make the motorcycles ready for use, Yamaha could not escape liability for a defect in the motorcycle on the ground that it may have been caused by something that its authorized dealer, Harley-Davidson of Essex, did or failed to do in attaching the front wheel to the fork of the subject motorcycle. Yamaha's manual, subsequently published, recognized the danger in this function when it noted a 3 mm. tolerance in the side play  a limit which could be exceeded, according to plaintiff's expert, by insufficient tightening of the particular nut at the end of the bolt.
*291 If the jury should find that the dealer's lack of a sufficient tightening of the particular nut was the cause of the front wheel's failure to rotate, then the jury might also visit responsibility upon defendant manufacturer for the function delegated by it to be performed by the dealer and not properly performed.
There is no need at this time to determine the rights of defendants inter sese. Each defendant has filed a cross-claim against the other, thus making it proper to keep all parties in the suit. The issue proposed by the cross-claim may never arise if the jury returns a verdict of no cause for action against all defendants. But, on the other hand, it might in the event of a verdict for plaintiffs. We decide only that reversible error was committed in not submitting the issue to the jury as to all the defendants.

II
In view of our remand for a new trial, we find it unnecessary to decide plaintiffs' second point. The evidence excluded was a manual published by Yamaha subsequent to the accident. But see Hansson v. Catalytic Constr. Co., 43 N.J. Super. 23, 27 (App. Div. 1956), and our Rules of Evidence, Rules 4 and 51. We do not wish to preclude the trial judge from ruling on the issue of admissibility on the basis of the proofs offered at the new trial.
The judgments are reversed, and the matter is remanded for a new trial.