**RARITAN TRUCKING CORPORATION, a corporation of the State of New Jersey, Appellant,**

v.

**AERO COMMANDER, INC., et al.**

**No. 71-1027.**

United States Court of Appeals, Third Circuit.

Argued Dec. 13, 1971.

Decided April 14, 1972.

John W. Taylor, East Orange, N. J., for appellant.

Thomas F. Daly, McCarter & English, Newark, N. J. (Nicholas Conover English, Newark, N. J., on the brief), for appellee Continental Can.

Before VAN DUSEN and HUNTER, Circuit Judges, and LAYTON, Senior District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

Appellant Raritan Trucking Corporation ("Raritan") brought this action to recover property damages resulting from a plane crash, for which damages the appellee Continental Can Corporation ("Continental") is allegedly responsible. The action was commenced in the Superior Court of New Jersey, Law Division, Middlesex County, against three defendants and from there it was removed by the defendants to the United States District Court.[1] At trial at the close of the plaintiff's case, the District Court directed verdicts[2] and entered judgment in favor of all defendants. Raritan appeals only from the entry of judgment in favor of Continental.

The ill-fated airplane was an Aero Commander Model 680 FP, owned by Raritan at the time of the crash. Prior to the crash the airplane was garaged in

1. Federal jurisdiction rests on diversity of citizenship. Plaintiff Raritan is a New Jersey corporation whose principal place of business is in New Jersey. Defendant Continental is a New York corporation with its principal place of business there, and defendant Rockwell Standard Corporation is a Pennsylvania corporation whose principal place of business is in that state. Rockwell Standard would have been liable to Raritan only because of its admitted assumption of the liabilities of the plane's manufacturer, Aero Commander, Inc., a third defendant, in connection with the merger of those two companies. The amount in controversy clearly exceeds, exclusive of interest and costs, the sum of $10,000. *See* 28 U.S.C. §§ 1332, 1441.

2. Although the District Court stated that it was dismissing the complaint, the dismissal is properly treated as a directed verdict since this case was tried with a jury. Sano v. Pennsylvania R.R., 282 F.2d 936, 938 (3d Cir. 1960); O'Brien v. Westinghouse Electric Corp., 293 F.2d 1, 9–10 (3d Cir. 1961); *compare* Fed.R.Civ. P. 41(b) *with* Fed.R.Civ.P. 50(a); *see* Notes of Advisory Committee on 1963 Amendment to Fed.R.Civ.P. 41.

Continental's hangar at Morristown, New Jersey, and was serviced there by Continental. The airplane crashed on October 27, 1963, near White Sulphur Springs, West Virginia, at the end of a flight from the Morristown Municipal Airport. There was strong evidence from which the jury might have concluded that the cause of the crash was a wing separation that occurred as the pilot engaged in aerobatic maneuvers in an effort to lower a malfunctioning landing gear.

■ Raritan's complaint against Continental was based on two alternative theories: (1) negligence in inspecting, maintaining, and servicing the airplane, and (2) breach of warranty or strict liability in tort.[3] Since this appeal arises from a directed verdict for the defendant, "[t]he evidence, including the inferences of which it is reasonably susceptible, must be viewed in the light most favorable to the plaintiff." Viking Theatre Corp. v. Paramount Film Distributing Corp., 320 F.2d 285, 288 (3d Cir. 1963), aff'd by an equally divided court, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964). See 5A Moore's Federal Practice ¶ 50.02 [1], at 2326-9 (2d ed. rev. 1970). And since this is a diversity case, we are required to apply the law of New Jersey in determining whether the evidence, thus viewed, constituted an actionable claim against Continental on either of the two grounds upon which relief was sought. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Waldron v. Aetna Casual-

ty & Surety Co., 141 F.2d 230 (3d Cir. 1944); Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908 (3d Cir.), cert. denied, 334 U.S. 846, 68 S.Ct. 1516, 92 L.Ed. 1770 (1948); Lind v. Schenley Industries, Inc., 278 F.2d 79 (3d Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960); see 5A Moore's Federal Practice ¶ 50.06 (2d ed. 1966). We conclude that the evidence presented by Raritan established a prima facie case against Continental, and thus we reverse and remand for a new trial.

## I. EVIDENCE OF NEGLIGENCE

■ Recovery may be had in New Jersey for damages caused by a defendant's negligence—"conduct which falls below a standard recognized by the law as essential to the protection of others from unreasonable risks of harm." Sanzari v. Rosenfeld, 34 N.J. 128, 134, 167 A.2d 625, 628 (1961). "The standard of care is the conduct of the reasonable man of ordinary prudence under the circumstances. . . . The greater the risk, the greater is the care required— the reasonable man would so behave." Ambrose v. Cyphers, 29 N.J. 138, 144, 148 A.2d 465, 468 (1959). It is virtually beyond dispute that under the circumstances of this case Continental was required to exercise an increased amount of care in its maintenance of Raritan's plane, since any malfunction might well have disastrous consequences.

It is also clear, however, that

"recovery cannot be had merely upon proof of the happening of an accident.

---

3. Raritan's complaint against Aero Commander and Rockwell Standard was likewise based on the alternative grounds of negligence and strict liability in tort, in connection with the design, manufacture, and selling of the airplane.

In addition to denying negligence and breach of warranty, Continental alleged that Raritan's pilot had been negligent in attempting to lower the landing gear through aerobatic maneuvers, and that Raritan was thus barred by reason of contributory negligence from recovering damages. In New Jersey contributory negligence constitutes a defense in an action grounded on negligence, Dziedzic v.

St. John's Cleaners & Shirt Launderers, Inc., 53 N.J. 157, 249 A.2d 382 (1969), Stoelting v. Hauck, 32 N.J. 87, 159 A.2d 385 (1960), Ferrie v. D'Arc, 31 N.J. 92, 155 A.2d 257 (1959), as well as in an action grounded on breach of warranty or strict liability in tort, Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463, 251 A.2d 278 (1969); Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965); Maiorino v. Weco Products Co., 45 N.J. 570, 214 A.2d 18 (1965). But the issue would have been one for the jury in the light of evidence that the pilot's actions were reasonable under the circumstances.

Negligence is never presumed; it, or the circumstantial basis for the inference of it, must be established by competent proof. . . ."

Murphy v. Terzako, 14 N.J.Super. 254, 259, 82 A.2d 1, 3 (App.Div.1951); *see also* Mockler v. Russman, 102 N.J.Super. 582, 588, 246 A.2d 478, 480 (App.Div. 1968), certif. denied, 53 N.J. 270, 250 A.2d 135 (1969).

"[T]he existence of a possibility of a defendant's responsibility for a plaintiff's injuries is insufficient to impose liability. '. . . [T]he evidence must be such as to justify an inference of probability as distinguished from the mere possibility of negligence on the part of the defendant.'"

Hansen v. Eagle-Picher Lead Co., 8 N.J. 133, 141, 84 A.2d 281, 285 (1951). Whether the evidence produced by Raritan was sufficient to justify such an inference is the question we face now.

Raritan was able to produce no evidence of specific acts or omissions by Continental that might have caused the landing gear to malfunction. Nevertheless, there was circumstantial evidence that might have convinced the jury that Continental had been negligent in servicing the landing gear.

Evidence produced at trial showed that Raritan had taken possession of the plane in October 1962 at which time the plane had been flown ten and one-half hours, and that at the time of the crash one year later, total flight time was about 275 hours. It would be reasonable to suppose that during the year the plane had landed many times and that the landing gear had operated successfully each time.

Service Bulletin No. 83 was issued by Aero Commander, Inc., the manufacturer of the plane, on September 13, 1963. The purpose of the Service Bulletin was to correct a possible landing gear strut overextension that would "prevent the gear from locking when placed in the up position." Part I of the bulletin called for inspection of the strut within the next 25 hours' flight time, while Part II of the bulletin specified modifications to prevent future strut overextension. Compliance with Part II was to be immediate in cases where strut overextension was found during the Part I inspection, but could be deferred in cases where no overextension was found during the Part I inspection.

The Aircraft Flight Log shows that on October 16, 1963, Continental performed Part I of the Service Bulletin and found no strut overextension. After this inspection the plane was flown about 16 hours and made 15 landings with no noted difficulty. On October 25 Continental undertook the modifications required by Part II of the Service Bulletin, and on the very next flight two days later the crash occurred.

■ Although Raritan presented evidence of circumstances that might have some slight relevance to Continental's negligence,[4] we believe that the infer-

---

4. Part II of Service Bulletin No. 83 required that the letter "A" be added to the landing gear strut plane to memorialize the modification, and here the letter "A" was absent from the strut plate. Although the absence could have had no direct causal connection with any malfunction, it does indicate that Continental had not complied with Part II of the Service Bulletin in all respects.

Another witness, Robert Lewis Quaintance, who was present when the landing gear was disassembled *after* the crash, testified that a certain spring was loose. Any inference of negligence from this testimony would be minimal, however, since no attempt was made to show how the loose spring could have caused the gear to malfunction.

Raritan argues in addition that the jury could infer from the testimony of Burnice W. Stamp, Continental's hangar foreman, that Continental had failed to comply with another section of Part II of the Service Bulletin which called for cycling of the landing gear three times to insure proper functioning. It is true that in listing the separate steps involved in the Part II modification, Stamp never stated that the cycling operation was done. But he was never specifically asked if the cycling had been carried out, and from the summary way in which Stamp listed

ence of negligence arising from the malfunction alone was sufficient to justify submitting the case to the jury.

The law in New Jersey as to res ipsa loquitur has not changed insofar as relevant here since it was applied in Joseph T. Ryerson & Sons v. H. A. Crane & Bro., 417 F.2d 1263 (3d Cir. 1969). There we stated:

"The law of New Jersey which controls this lawsuit generally requires the plaintiff to satisfy three elements for a res ipsa loquitur charge:

"(1) The accident which produced the injury was one which ordinarily does not happen unless someone was negligent;

"(2) The instrumentality or agency which caused the accident was under the exclusive control of the defendant; and

"(3) The circumstances indicated that the untoward event was not caused or contributed to by an act or neglect on the part of the injured person." 417 F.2d at 1265.

Here, although the question is close, we believe that the requisite elements were satisfied. An airplane's landing gear does not ordinarily stick in the up position unless there has been some breach of care on the part of someone. The circumstances here indicate that the landing gear failure was not caused or contributed to by any of Raritan's employees.[5]

As to the "exclusive control" requirement, New Jersey has liberalized greatly

the literal meaning of that term. In Lorenc v. Chemirad Corp., *supra* n. 4, the Supreme Court of New Jersey stated:

"Modern manufacturing, packing, shipping and marketing conditions . . . brought the realization that to hold strictly to the view that inferences of negligence became permissible only on proof of exclusive control of the injuring agency at the time of the mishap would largely destroy the efficacy of the principle [of res ipsa loquitur]. The result was a sensible and logical broadening so as to permit the inference where the total circumstances showed a probability that defendant's lack of due care while the agency was in his possession and control was responsible for the casualty, and eliminated the probability of efficient participation by some other cause. [Citations omitted.] Harper & James suggest that as generally applied the requirement for exclusive control 'is more accurately stated as one that the evidence must afford a rational basis for concluding that the cause of the accident was probably "such that the defendant would be responsible for any negligence connected with it." ' 2 *The Laws of Torts* (1956) p. 1086. The present contours of the principle represent no more than an effort on the part of the law to adapt itself to the current environment." 37 N.J. at 70–71, 179 A.2d at 408.

As we stated in the *Ryerson* case, *supra*.

"Both the Restatement and the law of New Jersey contemplate that the

---

the steps taken, his omission would be understandable and any inference that the cycling had not been done would be exceedingly weak.

The fact that Raritan sought to prove specific acts of negligence would not preclude its reliance upon res ipsa loquitur if the facts otherwise warranted application of that doctrine. Lorenc v. Chemirad Corp., 37 N.J. 56, 62, 179 A.2d 401, 404 (1962) ; Reiter v. Max Marx Color & Chemical Co., 35 N.J. 37, 42, 170 A.2d 785, 787 (1961).

5. The fatal flight was the first flight after Continental had performed Part II of

the Service Bulletin. A Continental employee had removed the plane from the hangar to the runway. Both Raritan pilots were shown to have had long experience in flying. They were instructed to fly the plane to White Sulphur Springs to pick up passengers, and there was no evidence that they did not fly directly there. The landing gear itself was not accessible from the pilot's position. We can imagine little in addition that Raritan could have shown to indicate that the landing gear failure had not been caused or contributed to by Raritan through its employees.

plaintiff eliminate all other possible causes by a preponderance of the evidence." 417 F.2d at 1266.

Raritan produced two expert witnesses, both of whom testified, in essence, that the failure of the landing gear to operate properly might have been due to one of two different causes: (1) failure of the uplock mechanism to operate, and (2) overextension of the landing gear itself.[6] The District Court in directing a verdict for the defendants assumed that the manufacturer would be responsible for an uplock mechanism failure, while Continental would be responsible for an overextension of the landing gear.[7] While such an assumption would seem inappropriate on the record,[8] the fact that Continental might have been responsible for either of the suggested causes of the malfunction does not change appreciably the issue we face, since the record does not eliminate the possibility that the manufacturer may have been responsible for the landing gear malfunction.

Nevertheless, there was sufficient evidence from which the jury might rea-

---

6. Raritan's expert witness William John Heinz, an engineering consultant, testified:

"... I believe that the gear bound in the nacelle. Now I have eliminated many possible choices for its binding in the nacelle. By engineering analysis I come up with two probable reasons why it would be bound in the nacelle. One is failure of this uplock mechanism to release the uplock bracket and allow the gear to come down. The second is an improper extension of this oleo that we spoke of causing the tire and/or a section of the gear itself to bind in this nacelle. So that the gear would be, in fact, bound into the nacelle."

Under cross-examination, Heinz was unable to state which of the two possible causes had in fact caused the gear to malfunction.

Raritan's expert witness Paul K. Goldberg, another consulting engineer, testified:

"The two probabilities that I will give for a malfunction of this particular gear was, one, the up-lock mechanism failed to release; and two, the gear improperly extended, binding on the nacelle, which did not allow the gear to come down. These are the two probable explanations for the gear malfunction in my opinion."

As did the witness Heinz, Goldberg testified that he was unable to say which problem caused the malfunction. Goldberg earlier in his testimony apparently attempted to give his opinion about four other possible causes of landing gear failure that had been listed in the "Aero Commander Maintenance Manual," which had been read into the record by an earlier witness. Because Goldberg was not allowed to testify about those four causes, we cannot be sure whether he sought to adopt them. But his later testimony would seem to rule out the possibility that he considered causes other than the two he stated to be likely causes of the landing gear failure.

7. In taking the case from the jury, the District Court stated:

"Now, there are two defendants here. One, the manufacturer, and one the service organization. [The expert witnesses] have reconstructed for us their versions of what happened. They have eliminated all causes but two. And for one cause, the manufacturer would be liable. For the other cause, the service men would be liable .... I cannot permit the jury to guess as between the probable causes .... These two engineers cannot assess the blame on either, and it was one of two. And since they can't do it, I can't allow you to speculate."

8. There was no testimony that Continental would not be responsible for a failure of the uplock mechanism. Nor did Raritan's counsel stipulate that fact; the following exchange makes this clear:

"THE COURT: May I make an inquiry? Your two experts ... have said they would not make decisions as between the failure of the locking device. Who would be responsible for that?

"MR. TAYLOR [Raritan's counsel]: I think that would be a manufacturing defect. And I think also, it could be a servicing defect.

"THE COURT: And—

"MR. TAYLOR: Improper performance.

"THE COURT: Improper performance. Too great an extension or binding of the landing gear—who would be responsible for that? Wouldn't that be Continental Can?

"MR. TAYLOR: I think it would be, sir. ..."

sonably conclude that Continental and not the manufacturer was responsible for the landing gear failure. The fact that the plane had flown more than 275 hours without complaint about the landing gear would support an inference that there was no manufacturing defect in the landing gear. Moreover, the fact that Continental had done extensive work on the landing gear immediately before the fatal flight might lead to the reasonable inference that some default on the part of Continental rather than the manufacturer was the actual cause of the malfunction.

In Sabloff v. Yamaha Motor Co., 113 N.J.Super. 279, 273 A.2d 606 (App.Div.), aff'd per curiam, 59 N.J. 365, 283 A. 2d 321 (1971), the plaintiff was injured when the front wheel of his motorcycle suddenly stopped turning.

"Plaintiff's expert gave two *possible* causes of the front wheel's failure to rotate. Plaintiff's testimony negated the one—error on the part of plaintiff in activating the brake. This left the second cause—improper tightening of the nut at the end of the axle bolt, thereby producing excessive side play and locking of the wheel—'available to the jury without recourse to speculation'. . . ." 113 N.J.Super. at 288,

273 A.2d at 610–611 (emphasis in original).

*See also* Smith v. Frontier, Inc., 53 Wash.2d 805, 337 P.2d 299 (1959), discussed with approval by the court in *Sabloff, supra.*

 That there is reasonable basis for such an inference in this case makes inapplicable those New Jersey cases holding that

"where it appears that the injuries were occasioned by one of two causes, for one of which defendant is responsible, but not for the other, the plaintiff must fail, if the evidence does not show that the injury was the result of the former cause. If, under the testimony, it is just as probable that it was caused by the one as the other, he cannot recover."

Stumpf v. Delaware, L. & W. R. R., 76 N.J.L. 153, 69 A. 207 (Sup.Ct.1908). *See also* McCombe v. Public Service Ry., 95 N.J.L. 187, 112 A. 255 (Ct.Err. & App.1920); Dunn v. Hoffman Beverage Co., 126 N.J.L. 556, 20 A.2d 352 (Ct. Err. & App.1941); Woschenko v. C. Schmidt & Sons, 2 N.J. 269, 66 A.2d 159 (1949); Hansen v. Eagle-Picher Lead Co., *supra*; Jakubowski v. Minnesota Mining & Mfg. Co., 42 N.J. 177, 199 A. 2d 826 (1964).[9]

---

**9.** Because we hold that Raritan presented sufficient evidence to support a finding that Continental alone was responsible for the landing gear failure, we do not decide the possible application of two recent New Jersey cases, Nopco Chemical Division v. Blaw-Knox Co., 59 N.J. 274, 281 A.2d 793 (1971), and Jackson v. Magnavox Corp., 116 N.J.Super. 1, 280 A.2d 692 (App.Div.1971). These cases stand for the proposition that in cases "[w]here it is virtually certain that *one of two defendants* is responsible for plaintiffs' injuries, and the evidential key as to which it is, is peculiarly within the knowledge of defendants, it is fair that the defendants be called upon to furnish information upon the basis of which the jury can determine the responsible party." Jackson v. Magnavox Corp., *supra*, 116 N.J.Super. at 7, 280 A.2d at 695–696 (emphasis in original). Accordingly, in such cases the plaintiff avoids a directed ver-

dict by proving the nature of his injury, the identity of the defendants, and the capacity in which the defendants may have been responsible for the injury.

Continental has argued that *Nopco* is inapplicable here. That case involved damage to a machine that had been in the possession of the manufacturer and several carriers and bailees during shipment to the plaintiff, and it is argued that the case extends no further than the transportation-bailee situation. We agree that language in the *Nopco* opinion shows that the transportation-bailee relationship situation was important in the decision in that case. But that consideration does not serve to distinguish *Jackson*, which was an ordinary negligence case not involving transportation-bailee considerations.

*See also* Wollerman v. Grand Union Stores, Inc., 47 N.J. 426, 221 A.2d 513 (1966).

## II. BREACH OF WARRANTY OR STRICT LIABILITY IN TORT

Although actions based on breach of implied warranty of fitness and those based on strict liability in tort may be distinguished, in New Jersey the two actions have tended to become merged.[10] In discussing the doctrine of strict liability in tort, the New Jersey Supreme Court in Santor v. A. & M. Karagheusian, Inc., *supra* n. 10, stated:

"Such doctrine stems from the reality of the relationship between manufacturers of products and the consuming public to whom the products are offered for sale. As we indicated in [Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960)], the great mass of the purchasing public has neither adequate knowledge nor sufficient opportunity to determine if articles bought or used are defective. Obviously they must rely upon the skill, care and reputation of the maker. [Citation omitted.] It must be said, therefore, that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. . . .

"Under the strict liability in tort doctrine, as in the case of express or implied warranty of fitness or merchantability, proof of the manufacturer's negligence in the making or handling of the article is not required. If the article is defective, *i.e.*, not rea-

sonably fit for the ordinary purposes for which such articles are sold or used, and the defect arose out of the design or manufacturer or while the article was in control of the manufacturer, and it proximately causes injury or damage to the ultimate purchaser or reasonably expected consumer, liability exists." 44 N.J. at 64–65, 66–67, 207 A.2d at 311, 313.

■ From its origin in the *Henningsen* case cited in the text quoted above, the strict liability theory has grown to be a strong one in New Jersey.[11] But to date no New Jersey case has extended the strict liability theory to a case in which there have been no goods or other property supplied. Nor do we think that the New Jersey courts would extend strict liability to this case.

We appreciate the argument that in the instant case many of the policy considerations supporting strict liability in sales cases are present. In Cintrone v. Hertz Truck Leasing & Rental Service, *supra* n. 11, the New Jersey Supreme Court outlined the considerations that led it to apply strict liability in a case involving an accident caused by defective brakes in a rented truck:

"Most of the significant criteria which in sales transactions give rise to an implied warranty of fitness or which support a cause of action based on strict liability in tort, are present in the type of lessor-lessee relationship now before us. (1) The risk of harm to the lessee, his employees, pas-

10. *See* Santor v. A. & M. Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965); LaRossa v. Scientific Design Co., 402 F.2d 937 (3d Cir. 1968).

11. *See,* in addition to *Henningsen* (defective automobile), Courtois v. General Motors Corp., 37 N.J. 525, 182 A.2d 545 (1962) (rear wheel on tractor-trailer came off, injuring plaintiff's ward); Santor v. A. & M. Karagheusian, Inc., *supra,* (defective carpeting); Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314

(1965) (dangerous design of hot water system in home); Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965) (defective brakes in leased truck); Rosenau v. City of New Brunswick, 51 N.J. 130, 238 A.2d 169 (1968) (defective water meter); Totten v. Gruzen, 52 N.J. 202, 245 A.2d 1 (1968) (improper design of home heating system); Newmark v. Gimbel's, Inc., 54 N.J. 585, 258 A.2d 697 (1969) (action against beauty parlor by patron injured by permanent wave solution).

sengers, and members of the public from the operation of a defective truck on the highways is great; (2) the representation of the lessor that the vehicles are fit for use for the lessee's purposes is of major proportions. (The service, maintenance and repair undertaking in this case . . . magnifies the representation of fitness.); (3) the reliance of the lessee on the representation of the lessor is bound to be great." 45 N.J. at 456, 212 A.2d at 781.

Here we have a similar risk of harm to Raritan, its employees, passengers, and members of the public from the operation of a plane with inoperable landing gear. In turning the plane over to Raritan after repairing it, Continental necessarily represented that the landing gear remained in proper operating condition. And Raritan's reliance was, of necessity, great. Raritan had neither adequate knowledge nor sufficient opportunity to determine if the work on the landing gear had left it in proper operating condition, and thus had to rely upon the skill, care, and reputation of Continental. Because these elements are present here, we are convinced that application of strict liability by the New Jersey courts in this case cannot be predicted with great assurance.

There is much to suggest, however, that New Jersey would restrict application of strict liability to those cases involving sales of goods or other property and to those involving transactions analogous to sales.

In Magrine v. Krasnica, 94 N.J.Super. 228, 227 A.2d 539 (Hudson County Ct., L.Div.1967), aff'd per curiam sub nom. Magrine v. Spector, 100 N.J.Super. 223, 241 A.2d 637 (App.Div.1968), aff'd per curiam, 53 N.J. 259, 250 A.2d 129 (1969), strict liability was held not to extend to an action against a dentist by a patient injured when a latently defective hypodermic needle broke in the patient's jaw. The court considered at length the policy considerations supporting strict liability and found those considerations inapplicable, noting:

"[T]he *essence* of the transaction between the retail seller and the consumer relates to the *article sold.* The seller is *in the business* of supplying the product to the consumer. It is that, and that alone, for which he is paid. A dentist or a physician offers, and is paid for, his professional services and skill. That is the *essence* of the relationship between him and his patient.

" . . . Defendant dentist is not in the business of supplying needles." 94 N.J.Super. at 235–236, 227 A.2d at 543–544.

This court relied in part upon the *Magrine* decision in LaRossa v. Scientific Design Co., *supra* n. 10, where we noted:

"In all the cases decided by the New Jersey courts there existed a defect in the product which caused the injury to the ultimate consumer. Even when described as strict liability in tort the underlying principle has been analogized to the sale of goods. . . .

"Whatever may be the ultimate limit of the rule of strict liability in tort in New Jersey there lies at the foundation of the decided cases a defect in the product which caused injury to the innocent user." 402 F.2d at 941, 942.

That case involved a wrongful death and survival action on behalf of a decedent who had contracted cancer as a result of his exposure to radioactive dust during the loading of a catalyst into a reactor, the entire operation being supervised by the defendant. We rejected there the argument that New Jersey would extend strict liability to such a case.

The New Jersey Supreme Court's treatment of the *Magrine* case in New-

mark v. Gimbel's, Inc., *supra* n. 11, is also instructive. There the plaintiff had been injured when an allegedly defective permanent wave solution was applied to her hair by the defendant beauty parlor. The court, in holding the beauty parlor strictly liable for defects in the permanent wave solution, was careful to note the sales aspects of what it saw as a "sales-service hybrid transaction." It will be noted that the court there did not hold that the beauty parlor operator would be strictly liable for nonnegligent mistakes in its own application of the solution, but only for defects in the solution itself.

The Supreme Court in *Newmark* distinguished the case before it from a dentist or doctor's services, especially those cases where the dentist or doctor administers medicines or provides them to the patient for home consumption, in which cases strict liability would not be imposed. The court noted:

> "Such men are not producers or sellers of property in any reasonably acceptable sense of the term. In a primary sense they furnish services . . . . Thus their paramount function—the essence of their function—ought to be regarded as the furnishing of opinions and services." 54 N.J. at 597, 258 A.2d at 703.

While the present case may be distinguishable in some respects from the professional services of a doctor or dentist, we believe that the distinction would not be sufficient to cause the New Jersey Supreme Court to apply strict liability in this case. Accordingly, insofar as Continental's liability was predicated on a theory of strict liability in tort, the District Court was correct in directing a verdict for the defendant Continental.

Thus the District Court's order granting a directed verdict and entering judgment for the defendant Continental Can Corporation will be reversed. The case will be remanded for further proceedings in accordance with this opinion.