Cristobal LEON and Maria Leon, Plaintiffs–Appellants,

v.

CATERPILLAR INDUSTRIAL, INCORPORATED, Defendant–Appellee.

No. 94–3152.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1995.

Decided Nov. 8, 1995.

As Amended Nov. 13 and Nov. 22, 1995.

---

Jay A. Charon, Carl A. Greci (argued), Spangler, Jennings & Dougherty, Merrillville, IN, Wanda E. Jones, Rubino & Jones, Munster, IN, for Plaintiffs–Appellants.

Stanley C. Fickle, Michael R. Conner (argued), Jan M. Carroll, Barnes & Thornburg, Indianapolis, IN, for Defendant–Appellee.

Before WOOD, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Cristobal and Maria Leon, citizens of the state of Indiana, filed a civil action, 28 U.S.C. § 1332(a) (diversity), against Caterpillar Industrial, Inc.,[1] a Delaware corporation with its principal place of business in the State of Illinois. Leon and his wife sought damages for injuries incurred while he was operating a Caterpillar forklift at the East Chicago, Indiana plant of Inland Steel ("Inland"), a manufacturer of steel. The plaintiffs' claims were based on strict products liability, negligence, and breach of express and implied warranty.[2] The parties agreed that Indiana substantive law governed.

At the pre-trial conference, the parties agreed upon an order in which Leon stipulated to drop his warranty claims. The case was tried before a jury and at the close of the evidence, Caterpillar made a motion for a directed verdict. The court granted the defendant's motion in part, dismissing the strict liability claim concerning the deadman's switch[3] on the forklift, and after the close of testimony, during the jury instruction conference, Leon requested that the court dismiss his negligence claims against Caterpillar, while his remaining claims based on strict products liability, alleging defects in the forklift's gear shift and parking brake, were presented to the jury. The jury returned a verdict in favor of Caterpillar and Leon appeals. We AFFIRM.

## I. FACTUAL BACKGROUND

Calumet Lift Truck, an authorized Caterpillar dealer, is incorporated in the state of Illinois, is owned and operated by Emil Aloia, and sells and services forklifts, including those manufactured by Caterpillar. The Calumet dealership is operated independently, is not a subsidiary of Caterpillar, and its rela-

---

1. Caterpillar Industrial, Inc., is in the business of manufacturing and distributing lift trucks.

2. Leon's complaint contained claims that Caterpillar "breached its implied warranty of fitness in that the aforementioned product was not of a merchantable quality, and was not safe and fit for the purpose for which it was intended," and that it "breached an express warranty in failing to manufacture and deliver said product in a condition of good material and workmanship and free from defects as required by the Uniform Commercial Code of Indiana."

3. *See, infra,* note 5.

tionship with Caterpillar is set forth in the Caterpillar Dealer Sales and Service Agreement, which reads in part as follows:

> **No Agency Relationship.** It is the intention of the parties that the relationship existing between them shall be that of independent contractors and vendor and vendee; that nothing herein contained or done pursuant hereto shall constitute Dealer a franchisee or agent of Company for any purpose whatever, and that all acts and things done and to be done by dealer pursuant to the provisions hereof or done by dealer in anticipation of this agreement, unless expressly otherwise provided herein, shall be at dealer's own expense and cost.

Calumet purchases equipment and products from Caterpillar and other manufacturers to resell to its customers, and the prices it pays for the Caterpillar products are calculated based on the quantity of goods purchased. Calumet receives volume discounts on Caterpillar products purchased, as specified in the sales agreement which provides that "sales by [Caterpillar] to [Calumet] shall be made at the prices and discounts specified by company from time to time." Caterpillar exercises no control over the prices Calumet charges its customers.[4]

The Calumet Lift dealership is a company separate and distinct from Caterpillar as evidenced by the fact that Caterpillar has no interest, financial or otherwise, in Calumet, nor does it share in the revenue, profits or losses of Calumet, much less does it have the authority to exercise any control over the day to day operations of Calumet. The only exceptions are that: (1) Calumet is required to "maintain a suitable place or places of business at the points shown in Exhibit A [of the agreement] to provide adequate sources of products and mechanical service for the products in the service territory [set forth].... The location of any additional places of business and the relocation or abandonment of any existing places of business may only be made with the consent of [Caterpillar];" and (2) if Calumet violates any provision of agreement, such as by failing to live up to its "parts and service responsibilities and performance," Caterpillar has reserved the right to terminate the agreement. As part of its contract, Caterpillar reimburses Calumet for warranty work performed on the Caterpillar units, as well as providing that representatives from Calumet must visit those who purchase Caterpillar products from time to time.

Calumet commenced selling forklifts to Inland in 1983, and after a short hiatus, renewed its sales relationship with Calumet in 1987. Caterpillar met with Inland representatives in 1987 to discuss the possibility of increasing Inland's use of Caterpillar equipment and services. Inland informed Caterpillar that it had purchased products from Calumet from 1983 to 1986, but terminated the relationship because it was not pleased with Calumet's warranty repair service, and was no longer interested in continuing the business relationship because of a problem with the Calumet representative assigned to the Inland account (Mr. Toft).

When Caterpillar learned of Inland's dissatisfaction with Calumet, they spoke with Aloia and thereafter, Toft was discharged and a new representative, Mr. Adams, was assigned the account. Adams met with Inland representatives over the course of a few months, smoothed over the troubled waters, and Inland re-instituted its business relationship.

In late 1987, Inland purchased twelve Caterpillar V90E forklifts from Calumet. As with every forklift Inland purchased since 1974, Inland required that they be equipped with a deadman's switch.[5] Caterpillar nei-

---

4. Calumet does not receive title to the forklifts it purchases from Caterpillar until it has made full payment of the purchase price.

5. The deadman's switch is activated or de-activated, as the case may be, when pressure is applied or released with someone sitting or arising from the seat, when the ignition is in the on position. When pressure is applied to the seat, *i.e.*, with someone sitting on it, a depressed spring alerts the transmission to engage the forklift. When the operator rises from the seat, the pressure on the cushion is released and the deadman's switch is supposed to disengage the transmission, transferring the forklift gear shift into neutral.

ther manufactured nor installed such a device, so Calumet, relying upon a suggestion from Inland, decided to install a deadman's switch manufactured by Hyster, a Caterpillar competitor.[6] At the same time, because Inland had received complaints about the contour of the Caterpillar seats from its employees, Inland requested that the forklifts be equipped with bucket seats, so Calumet replaced the Caterpillar seats with a seat manufactured by Hyster.

Calumet assembled and installed the deadman's switch and seat for the Inland units, combining the Hyster seat and the switch with the Modular Control valve, without any input or assistance, much less direction from Caterpillar. Although Caterpillar was aware that Inland's specifications included a deadman's switch and that Calumet modified the forklift units in order that it might comply with the specs,[7] it did not inspect the modified forklifts after the alterations were completed and ready for delivery. In 1987, Calumet delivered the twelve forklift trucks to Inland and in 1988, Calumet delivered two additional forklifts to Inland, which were the model Leon was operating when injured. The forklift unit which injured Leon was delivered to Inland six months before the accident, and it was equipped with Hyster's deadman's switch and foam contoured seat. Caterpillar was not consulted when these forklift trucks were altered to include the deadman's devices.

The facts surrounding Leon's accident are uncontested. Since 1986, Leon was classified at Inland as a furnace helper and was assigned to work in the Number Four Basic Oxygen Furnace building ("4BOF"), tending the two operating blast furnaces. One of his primary tasks was to use the forklift to empty the "spark box."[8] In emptying the spark box container, a furnace helper positions the forklift in front of the furnace, dismounts the unit to open the doors of the spark box, remounts the vehicle, retrieves the container from the furnace and empties it into a steel residue receptacle, positioned away from the furnace. Thereafter, the operator returns the container to its proper position in the furnace. On January 23, 1990, while Leon was completing the process of emptying and returning the container to the furnace, the accident occurred.

After backing up the forklift approximately ten to twenty feet, Leon raised himself from the seat and dismounted, which should have served to operate the deadman's switch and disengage the transmission gears, but they failed to disengage and as a result, the gear was not transferred into the neutral position. At the time of the accident, Leon was standing on the floor between the furnace and the forklift, facing the furnace, with his back to the unit, when the forklift suddenly lurched forward, striking Leon in the back, and pinning him against a steel column, causing injury to his back and ribs.[9]

David Dixon, one of Leon's co-workers and also a furnace helper, observed Leon closing the spark box and described the incident as follows:

> [Leon] was walking away, it was like the machine just lunged forward and the tires spun a little bit, went forward a little bit, and it kind of like started to bunny hop on the rails or the roughness of the floor itself, and started going towards [Leon].
>
> So, I yelled—I yelled as soon as the machine started moving, but then when I seen it veering toward him, I jumped off my machine and ran toward him, yelling toward him. And finally, I guess he did

---

**6.** The deadman's switch was connected to a solenoid control valve manufactured by Modular Controls. This valve is the mechanism which transfers the transmission into neutral by releasing the transmission pressure.

**7.** Caterpillar had knowledge that the forklifts would be used to lift the steel residue containers.

**8.** The spark box is a large metal basket that receives and contains residue accumulated in the steel making process.

**9.** Leon's doctor informed him that he would be able to return to work after recovery, but he would have to be assigned to light duty jobs. Leon attempted to perform a number of light assignments but none proved acceptable due to the limitations caused by the injury to his back; thus, he went on disability.

hear me, because he turned around just in time to see it—what was happening.

Leon's version of the events was that just prior to the accident, before he dismounted the unit, he had manually shifted the vehicle's transmission into neutral and applied the parking brake, as he was taught to do in Inland's thirteen hour vehicle operation safety training course. He stated that he failed to turn off the ignition, or lower the forks to the ground level,[10] in an attempt to save time. James Bradley, the manager of the steel making operation, testified that it would have taken Leon but one or two seconds to lower the forks.

At the request of Inland, Tom Newton, one of its mechanics, inspected the forklift some two hours after the accident, and observed that "the seat ... showed an appearance of exposure to heat. The upholstery was blistered. The foam had hardened and collapsed.... Because of the exposure to the heat, the seat itself had compressed and was ... activating the switch all the time." Thus, when an operator rose from the seat, the transmission remained engaged and the forklift remained operational.

George Bingley, a professional engineer who owns a design consulting business [11] in Kankakee, Illinois, testified as an expert for the plaintiff. He concurred with Newton that the foam in the seat had "deteriorated to the extent that it caused the switch not to react to the operator leaving the seat." Bingley further stated that the "deterioration was a hardening ... such that the foam had

lost its resilience and would stay in a particular position and not really bounce back."

At the close of the evidence, Caterpillar moved for Judgment as a Matter of Law (Directed Verdict) pursuant to Federal Rule of Civil Procedure 50(a).[12] The court denied the motion, but stated:

However, in this case, there is no evidence of agency. Therefore, regardless of whether the seat and deadman's switch were defective, the Defendant did not place them in the stream of commerce, and the Defendant is therefore not responsible for the defective condition under either theory of strict liability or negligence.

Therefore, Plaintiff is prohibited from arguing failure to warn of effects of heat on seat, failure to monitor and supervise those modifications to the forklift that's involved in the case, and the defective deadman's switch.

Also, Plaintiff cannot argue to the jury that this forklift was defective because it did not come from Defendant's factory with a deadman's switch upon the seat.

Also, the Defendant is prohibited from arguing that the defective deadman switch and seat caused this accident. In other words, the Defendant cannot argue that Aloia's modification of the seat by installing the Hyster seat and deadman's switch was a modification of this forklift that caused the accident.

After the judge announced his decision concerning the motion for a directed verdict, the plaintiff argued that the forklift was defective for the following reasons: [13] (1) the

---

10. Had the forks been in the lowered position, the forklift unit would have been automatically braked and could not have moved, whether it was in neutral or in gear. Lowering the forks and turning off the ignition are both safety precautions required by the safety procedures of Inland, Caterpillar, the American National Standards Institute (ANSI), as well as OSHA. The parties agree that Leon was instructed about these safety procedures at a training class before he was allowed to operate the forklift, and also had instruction manuals that detailed all of these safety regulations.

11. Bingley is an engineer registered in the states of Michigan and Illinois, and specializes in the materials handling industry, designing equipment like forklifts that are intended to lift significant weight loads.

12. Federal Rule of Civil Procedure 50(a) provides:

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

13. The jury considered and rejected each of these four theories of defect and we will not examine them in any detail because Leon does not appeal the jury's determinations concerning any of these hypotheses.

gear shift lever should have been located in a different position so as to make it impossible for an operator to knock it into gear when dismounting; (2) the forklift should have had a parking brake interlock system to deactivate the transmission and shift it into neutral when the parking brake was applied, even if the brake was not properly functioning; (3) the forklift should have been equipped with a parking brake dump valve which would also place the transmission in neutral when the parking brake was activated; and (4) a light should have been installed on the forklift indicating when the parking brake was out of adjustment. The jury returned a verdict in Caterpillar's favor, finding that the forklift was not defective when it entered the stream of commerce under any of the four theories presented by the plaintiffs. Leon appeals.

## II. ISSUES

Leon, the plaintiff, claims that the district court erred when it: (1) found as a matter of law that Calumet was not an agent of Caterpillar; (2) determined as a matter of law that Caterpillar was not liable for any defects in the deadman's switch and seat under a product liability theory because Caterpillar was not responsible for placing the deadman's switch and seat into the stream of commerce; and (3) instructed the jury that it could return a verdict in Caterpillar's favor if it found that Leon was guilty of misusing the forklift truck.

## III. DISCUSSION

### A. ACTUAL AND APPARENT AGENCY

#### 1. *Standard of Review*

■ In *Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330, 333 (7th Cir.1994), we held that in diversity cases, federal law governs the disposition of motions for directed verdicts. *See also, LaFollette v. Savage*, 63 F.3d 540, 543 (7th Cir.1995). We will affirm the district court's granting of the defendant's motion if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the plaintiff.]" Fed.R.Civ.P. 50(a); *Mayer*, 29 F.3d at 335 (a directed verdict should be affirmed if "reasonable persons

could not find that the evidence justifies a decision for a party on each essential element" of their claim); *LaFollette*, 63 F.3d at 543.

#### 2. *Analysis*

■ In 1942, the Supreme Court of Indiana adopted Section One of the Restatement of Agency which defines agency as "the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his *control,* and consent by the other to so act." *Universal Group v. Indiana Dept. of Revenue*, 642 N.E.2d 553, 556 (Ind.Tax 1994) (citation omitted). "Indiana ... requires an agent to be under the control of the principle. [Its] courts have never waivered from this definition." *Id.* at 557; *see also Mullen v. Cogdell*, 643 N.E.2d 390, 398 (Ind.App. 5 Dist.1994); *United Artists, Inc. v. Indiana Dept. of Revenue*, 459 N.E.2d 754, 758 (Ind.App. 1 Dist.1984) ("An agency relationship can exist only if the agent is subject to the principal's control with respect to the work details"); *Northern Assur. Co. of America v. Lark*, 845 F.Supp. 1301, 1306 (S.D.Ind.1993), *aff'd. sub nom. Northern Assur. Co. of America v. Summers*, 17 F.3d 956 (7th Cir.1994) (citations omitted) ("the keystone of the agency relationship is the principal's ability to define and control the agent's activities"). "The elements of actual agency are: (1) manifestation of consent by the principal; (2) acquiescence by the agent; and (3) control exerted by the principal." *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 850 (Ind.App. 1 Dist.1990) (citing *Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244, 1247 (Ind.App. 1 Dist.1984)).

■ Leon argues that he presented evidence sufficient to warrant submission of the question of whether Calumet was Caterpillar's agent to the jury. Indiana case law establishes that control over the day to day operations is the key to establishing an agency relationship. In *Mooney–Mueller–Ward, Inc. v. Woods*, the court enumerated certain factors that it considered to be the "details of work:" "Woods ... hired employees and set their wages and hours. He purchased sup-

plies, paid the rent, compiled tax data, and kept his own books and records . . . including the buying and selling of inventory." 175 Ind.App. 302, 371 N.E.2d 400, 403–04 (1 Dist. 1978); *see also Salingue v. Overturf*, 269 Ill.App.3d 1102, 207 Ill.Dec. 575, 576, 647 N.E.2d 1068, 1069 (5 Dist.1995) ("The determination of whether the relationship is principal/agent depends on a number of facts, including the manner of hiring, the right to discharge, the manner and direction of the work of the parties, the right to terminate the relationship, and the character of the supervision of the work done").

Although Leon relies on the sales agreement as evidence of agency, in spite of its disavowal of an agency relationship between Caterpillar and Calumet, the Indiana courts have held that the mere existence of a formal licensing or dealership agreement will not create an agency relationship in the absence of evidence that the principal is exercising control over the details of the purported agent's work. *United Artists*, 459 N.E.2d at 759. United Artists's ("UA") primary film distributor, in its licensing agreement with UA, required that UA use special prenumbered tickets, retained the right to inspect and monitor UA's records, and reserved control over the length of time that films could be exhibited, but the court held that the relationship did not rise to the level of an agency because UA independently owned and operated its own projection equipment, set its admission prices, had separate licensing agreements with various distributors, and showed films from these different distributors in UA theaters. *Id.* In the instant case, the only small measure of control Caterpillar exerted over Calumet's business was that it reimbursed Calumet for performing Caterpillar's warranty service and required Calumet to visit Caterpillar customers, but as UA, Calumet is independently owned and operated, it sets its own prices for equipment, and is free to enter into dealership agreements with companies other than Caterpillar.

Additionally, the sales agreement between Calumet and Caterpillar clearly sets forth the intent of the parties; "the relationship existing between them shall be that of inde-pendent contractors and vendor and vendee, that nothing herein contained or done pursuant hereto shall constitute Dealer a franchisee or agent of Company for any purpose whatever[.]" It is true that "the mere express denial of an agency relationship is not itself determinative of the matter. The true test in such a situation is how much control the principal has over the alleged agent and the intent and functioning of the parties." *Dutton v. International Harvester Co.*, 504 N.E.2d 313, 317 n. 2 (Ind.App. 4th Dist.1987) (citation omitted).

When we examine the operations of Calumet's business, as well as its relationship with Caterpillar, it becomes evident that this case is similar to that of *Mooney–Mueller*, in that Calumet manages its operations completely independent of its supplier, Caterpillar. Aloia, as sole owner, makes all of Calumet's day to day decisions, including, but not limited to, its financial and employment decisions without any input from Caterpillar. 371 N.E.2d at 403–04; *see also, Salingue*, 207 Ill.Dec. at 576, 647 N.E.2d at 1069.

The Supreme Courts of Alabama and Missouri have examined cases involving claims of agency relationships between independent dealerships and their suppliers much like the business relationship between Caterpillar and Calumet. In *Malmberg v. American Honda Motor Co., Inc.*, the court examined the issue of whether a dealer's (Tri–States) representations about Honda's warranty services constituted "substantial evidence of an agency relationship between American Honda and Tri–States." 644 So.2d 888, 890 (Ala. 1994). Malmberg argued that because Honda required that Tri–States provide a suitable place of business, maintain a minimum working capital, keep accurate records in accordance with Honda's uniform requirements, perform its warranty work, and permitted Tri–States to use the Honda name and trademark in its advertisements, Tri–States was Honda's agent. *Id.* The court, however, held that Honda retained no "control over *the manner in which Tri–States performed in order to meet the requirements of the . . . agreement. . . .* [It] did not provide day-to-day supervision for Tri–States. . . . Rather, the dealership agree-

ment left Tri–States in charge of determining how to conduct its business in order to comply with the ... agreement." *Id.* at 890–91.

Similarly, in *Wood v. Shell Oil Co.,* the court dealt with the issue of whether Wood presented sufficient evidence of an agency relationship between Shell Oil and Parker Shell, one of its independent dealers, to make the existence of such a relationship a jury question. 495 So.2d 1034, 1037 (Ala.1986). In that case, the parties entered into a written dealership agreement which explicitly stated that Parker was independent from Shell Oil and that Shell had no right to control any aspect of the dealer's business operations. *Id.* at 1036. Once Parker purchased gasoline and other products from Shell, it took title to those products. Parker made all the employment decisions for itself, it selected the products it would purchase, set the retail price for those products, and it was free to purchase competitor's products if it so desired. *Id.*

However, Shell specified that Parker must remain open 24 hours a day, as well as dictated the architectural style of Parker's service station, and retained the rights to inspect Parker's financial records, and cancel the dealership agreement for "failure of the dealer to comply or exert good faith efforts to carry out the provisions of the dealer agreement." *Id.* Finally, Shell required that Parker obtain its permission before displaying any posters or advertisements. *Id.* at 1036–37.

In spite of these terms in the agreement, the court held that:

> Wood has produced no evidence that Shell Oil retained any right of control over the manner in which Parker Shell performed in order to meet the requirements of the lease and dealer agreement. Although the lease and the dealer agreement specify, in some detail, what Parker Shell must do in order to conform to the terms of these contracts, and gives Shell Oil a right to approve certain aspects of Parker Shell's operation, they do not determine how Parker Shell is to achieve compliance with these terms.

*Id.* at 1037.

The Supreme Court of Missouri, when dealing with a like agency question, examined a case in which it faced the issue of whether two independent boat dealers who contracted with Mercury Marine, Inc. to sell their boats were Mercury's agents such that Mercury could receive service of process within the state of Missouri. *Bunting v. Koehr,* 865 S.W.2d 351, 352–53 (Mo.1993). The parties' sales agreements stated that each dealer was an "authorized dealer for the retail, sale, display, and servicing" of Mercury products, but the dealers were not required to sell exclusively Mercury products. *Id.* at 353. The dealers were required to provide warranty services for all Mercury products they sold, and instruct Mercury customers in the safe operation of Mercury Marine vessels. *Id.*

In order to decide whether the dealers were Mercury's agents, the *Bunting* court examined the Restatement (Second) of Agency § 14J, which provides:

> One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction; whether he is an agent for this purpose or is himself a buyer depends upon whether the parties agree that his duty is to act primarily for the benefit of one delivering the goods to him or is to act primarily for his own benefit.

The court noted that the word "primarily," as used in the Restatement, means "principally," and that the two dealers were "independent of Mercury Marine, [were] permitted to sell products of competing companies, and purchase[d] Mercury Marine motors primarily for the purpose of reselling them for [their] own profit." *Id.* at 354. Thus, the court concluded that the relationship between Mercury and these dealers was one of buyer and seller, not principal and agent. *Id.*

At trial, Leon failed to establish that Calumet was acting as Caterpillar's agent because Caterpillar exercised a very limited degree of control over Calumet's operations. Calumet is an authorized Caterpillar dealer who purchases products and equipment from Caterpillar, including forklifts, with title and possession passing from Caterpillar to Calumet

only after Calumet has made full payment. Calumet, in turn, resells the products to its customers at prices set by Calumet, and retains the profit. Thus, the relationship is similar to the one in *Bunting,* in that Calumet sells Caterpillar products principally to make a profit for itself, not for Caterpillar. 865 S.W.2d at 354. Aloia testified that Calumet passes along volume discounts it receives from Caterpillar to its customers, and in its appellate brief, Caterpillar stated that it expects that Calumet will do so, but there is no provision in the Sales Agreement mandating that Calumet include these discounts in the prices it sets for its customers. The fact that Calumet could sell Caterpillar's competitors' equipment is further evidence that Calumet was not acting principally for Caterpillar's benefit, but rather as an independent sales representative, to make a profit.

Although Calumet is allowed to use Caterpillar's name and trademark in its advertisements, the mere fact that Calumet uses Caterpillar's name does not render it an agent of Caterpillar, just as every bar which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise. Aloia's testimony is uncontroverted that Caterpillar provides no direction or consultation to Calumet regarding its day to day operations. Caterpillar can cancel its sales agreement with Calumet under very limited circumstances, or "if there is a material breach by [Calumet] of any . . . provision of [the] agreement," but this can hardly be considered as the ability to cancel the agreement "essentially at will," as Leon argues.

We hold that in light of the totality of the evidence, as well as the very language in the sales agreement, which expressly disavows an agency relationship between Calumet and Caterpillar, and Caterpillar's minimal involvement in certain limited aspects of Calumet's business, *i.e.,* service and warranty work, its business tie falls short of rising to the level of control necessary to establish an agency relationship.

In so holding, we note that our conclusion is consistent with the District of Columbia Circuit's opinion in *Hull v. Eaton Corp.,* 825 F.2d 448 (D.C.Cir.1987). In that case, a manufacturer sold a forklift to one of its dealers who then altered the lift to enable it to carry heavier loads. *Id.* at 458. The court found that the dealer was not the manufacturer's agent because the manufacturer sold the forklift in a finished condition, and "[a]part from a few general guidelines on business practices, [the dealer] had complete control of its operations." *Id.* As the manufacturer in *Hull,* Caterpillar sold the forklift to Calumet in a work ready condition,[14] and merely provided Calumet with guidelines concerning their duty to provide warranty service, the limitations thereon, and to visit Caterpillar customers.

■ Although we have concluded that no "actual" agency relationship existed between Calumet and Caterpillar, we next address Leon's claim of apparent agency, as set forth in his appeal, an issue not presented to the jury in light of the trial judge's finding that there was no evidence to support an inference of either an actual or apparent agency relationship between Caterpillar and Calumet. "In addition to agency arising by written or parol agreement, an agency relationship may be implied by conduct also. This is the common law concept of apparent agency." *Lark,* 845 F.Supp. at 1308. "Like an actual agency relationship, an apparent agency is also initiated by a manifestation of the principal." *Chellew,* 460 N.E.2d at 1248 (citations omitted).

However, the manifestation is one made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal. The essential element being there must be some form of communication, direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party. Manifestations or statements made by the agent are not sufficient to create an apparent agency relationship.

---

**14.** *See,* Section III.B.2, *infra,* for a complete discussion concerning the condition in which Cater-

pillar delivered the forklift to Calumet.

*Swanson v. Wabash College,* 504 N.E.2d 327, 332 (Ind.App. 1 Dist.1987). Leon argues that Caterpillar manifested authority over Calumet's operation to Inland because Caterpillar had knowledge that Calumet was going to install a deadman's device on the forklifts it sold to Inland and Caterpillar took the initiative to restore a business relationship between Calumet and Inland, thereby manifesting a degree of authority over Calumet's relationships with Inland.

Although Caterpillar did assist in facilitating the renewal of the business relationship between Calumet and Inland Steel, and was aware that a deadman's switch would be installed on its units, Caterpillar did not concern itself with the implementation process Calumet intended to employ in order that it might comply with Inland's specs. Caterpillar had no involvement in (1) the decision to install a deadman's switch; (2) the engineering or mechanical installation of the switch; or (3) the brand of switch to be installed. Furthermore, Caterpillar was never consulted concerning the substitution of the Hyster contour seats that Calumet installed, and thus had no knowledge that its seats would be replaced with ones manufactured by Hyster. These facts, coupled with the addition of the Hyster deadman's switch, also help to persuade us that there was no apparent agency relationship between Caterpillar and Calumet. At the time of the negotiations concerning the redesigned forklift units, Inland's discussions about the deadman's switches, and its follow up inspection of the deadman's switches and seats were with Calumet, not with Caterpillar representatives. We can only assume that because Leon has been unable to provide us with case cites in support of his proposition that mere knowledge of proposed substantial alterations coupled with Caterpillar's assistance in the renewing of reinstitution of Calumet's relationship with Inland creates an apparent agency relationship, that there is no authority for his contention; thus, his argument is less than convincing.

The facts presented at trial fall short of supporting an inference that either Inland or Leon could have held a reasonable belief that Calumet was acting as an agent of Caterpillar. Because the record is barren of evidence in support of a reasonable inference that an agency relationship existed between Caterpillar and Calumet, *Mayer,* 29 F.3d at 335, the district court did not err in deciding that no agency relationship existed as a matter of law. We will not reach beyond the limits of agency law to infer a relationship that did not exist; Leon sued the wrong party for the alleged defect in the deadman's switch and contoured foam seat.

### B. STRICT LIABILITY

The Indiana legislature codified the common law doctrine [15] of strict products liability in Ind.Code Ann. § 33–1–1.5–3 *et seq.* (Burns 1992):

(a) One who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to his property is subject to liability for physical harm caused by that product to the user or consumer or to his property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:

(1) The seller is engaged in the business of selling such a product; and

(2) The product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held responsible under this chapter.

(b) The rule stated in subsection (a) applies although:

\* \* \*

(2) The user or consumer has not bought the product from or entered into any contractual relation with the seller.

Thus, in order to impute strict liability to a seller, the plain language of the

---

**15.** The Indiana legislature, in creating a strict product's liability statute, "intended to incorporate the common law as it existed at the time of the adoption of the statute to the extent that it

was consistent with the statute." *FMC Corp. v. Brown,* 526 N.E.2d 719, 729 (Ind.App. 4 Dist. 1988); *aff'd,* 551 N.E.2d 444 (Ind.1990)

statute mandates that four prerequisites must be met: (1) the seller must be engaged in the business of selling the particular product which is the subject of the litigation; (2) the merchandise must have a defective condition which renders it unreasonably dangerous to a foreseeable user when it is placed into the stream of commerce; (3) the seller must place the product into the stream of commerce; and (4) the product must not be substantially altered by the time it reaches the consumer. Leon urges that the issue of whether Caterpillar was strictly liable for any defects in the deadman's switch should have been presented to the jury because: (1) Caterpillar is in the business of selling forklifts; (2) the forklift was placed in the stream of commerce when it was accepted by Inland; (3) Caterpillar was aware that Calumet would alter the forklift to meet Inland's deadman's switch specifications; (4) the forklift was not substantially altered before it reached Inland because the modifications were foreseeable and indeed, expected by Caterpillar; and (5) thus, the defendant should be held liable for any dangerous defects in the forklift as a result of the deadman's switch.

▮ Caterpillar engages in the manufacture and sale of forklifts; thus the first element of the strict liability case is met and we turn to the question of whether Caterpillar placed the allegedly defective mechanism into the stream of commerce for "Indiana only imposes liability upon manufacturers who place defective products into the stream of commerce. [The defendant's] liability, if any, only could have become 'operative' at the time it placed [the] product into the stream of commerce, not afterward." *Wixom v. Gledhill Road Mach. Corp.*, 514 N.E.2d 306, 308 (Ind.App. 4 Dist.1987).

The parties do not contend on appeal that the lift truck contained defects other than the deadman's switch and contoured foam seat. The plaintiff-appellant's expert witness, George Bingley, testified that the absence of a deadman's device on the Caterpillar forklift did not render the forklift dangerous or defective. When the unit left the Caterpillar factory, it was fully operational and equipped with a Caterpillar seat and had neither a deadman's switch nor a bucket seat. Calu-

met, in order that it might comply with Inland's specs for the sale of the units, altered the forklift, subsequent to the time that Calumet took possession of and title to the unit, and installed the Hyster deadman's switch and contoured seat. Thus, the allegedly defective mechanism (deadman's switch) was placed into the stream of commerce by Calumet after Calumet had substantially altered the forklift truck and subsequently delivered it to Inland.

Leon is also unable to establish the third requirement stated to impose strict liability on the manufacturer, *i.e.*, that the defendant, Caterpillar, sold a "product in a defective condition unreasonably dangerous to any user." Ind.Code Ann. § 33–1–1.5–3(a). The defect must exist "at the time [the product] is conveyed by the seller to another party," Ind.Code Ann. § 33–1–1.5–2.5(a), yet it is uncontested that the absence of a deadman's switch on the forklift when it left Caterpillar's factory did not render the unit defective.

▮ Leon likewise has failed to satisfy the fourth prerequisite to a finding of strict liability on Caterpillar's part because, as we discuss, *infra*, the forklift was substantially altered by the time it reached Inland.

Substantial change or alteration is defined as "any change which increases the likelihood of a malfunction, which is the proximate cause of the harm complained of, and which is independent of the expected and intended use to which the product is put." In a strict liability case, liability can be imposed on the manufacturer or seller even though [a] product is altered or changed if it is foreseeable that the alteration would be made and the change does not unforeseeably render the product unsafe.

*Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 938 (Ind.App. 4 Dist.1994) (quotations and citations omitted). *See also Bishop*, 814 F.2d at 443 ("Under Indiana law, a plaintiff can prevail under strict products liability theory only if he can demonstrate that the allegedly defective product reached him 'without substantial alteration in the condition in which it is sold' and that his injuries were caused as a result of the defective product").

In a product's liability action, in addition to the required statutory elements, a plaintiff must also establish proximate causation, and the "introduction of evidence concerning substantial alteration [is] relevant to the issue of proximate cause." *Kochin v. Eaton Corp.*, 797 F.Supp. 679, 683 (N.D.Ind. 1992), *aff'd without opinion* 986 F.2d 1424 (7th Cir.1993). "Most courts have held the normal proximate cause rules limiting liability to the foreseeable consequences of an action operate in the products liability area as in tort law generally." *Conder v. Hull Lift Truck, Inc.*, 435 N.E.2d 10, 14 (Ind.1982) (citations omitted).

> Proximate cause is established if the injury caused by the defendant is a natural and probable consequence which was, or should have been, reasonably foreseen or anticipated in light of attendant circumstances. Accordingly, an intervening cause, *e.g.*, the act or omission of a third party, will not operate to defeat a recovery from the defendant if the intervening cause would necessarily, or might reasonably, have been foreseen by the defendant. However, in some instances, the unforeseeable intervening negligent acts of a third party constitute a superseding cause which relieves the defendant of responsibility for the plaintiff's injuries.

*Conder*, 435 N.E.2d at 14 (citations omitted).

The principles guiding substantial alteration are similar to those required when establishing proximate cause: liability depends upon foreseeability. As we have discussed, in order to meet Inland's deadman's switch specs, Calumet, with neither direction from nor consultation with Caterpillar, assembled and installed the deadman's switch on the forklift in question, using parts from Hyster and Modular Controls. "The Indiana courts have held that any change which increases the likelihood of a malfunction ... *is a substantial* change," *Bishop*, 814 F.2d at 443 (emphasis in original, quotation omitted), and the alleged defect in the forklift was the deadman's switch and seat, which was added by Calumet. The deadman's switch is an integral part of the forklift truck as described herein, affecting the very operation and control of the unit, and its addition constituted a substantial change because by its very installation, it increased the likelihood that the unit would malfunction.

Leon's entire argument is premised on Caterpillar's mere knowledge of Inland's requirement for the installation of a deadman's switch. However, when pressed to supply legal support for this contention during oral argument, Leon's counsel merely referred to the "plain meaning of the statute." We do not interpret the statute in the same manner as the plaintiff's counsel for it requires more than mere general knowledge of alterations before it imposes strict liability upon a manufacturer.

Leon also relies on *Newton v. G.F. Goodman*, 519 F.Supp. 1301 (N.D.Ind.1981), in which the district court held that a "manufacturer is charged with a duty to anticipate what the environment will be like in which the product is to be used and what the foreseeable risks of such use are." *Id.* at 1306 (citing *Huff v. White Motor Corp.*, 565 F.2d 104 (7th Cir.1977)). The plaintiff contends that because Caterpillar knew that the forklifts were to be used in the steel making process, and in a building subject to extreme heat because of the presence of operating blast furnaces, it had a duty to ensure that the forklifts were equipped with heat resistant seats. But there is no proof in this record that the seat on the Caterpillar unit when it was sold and delivered to Calumet was not heat resistant.

This case can also be distinguished from *Newton* because the rubber cutting machine which was the subject of the products liability claim in *Newton* was manufactured entirely by Goodman, came equipped with exclusively Goodman equipment, and reached the consumer without substantial alteration. *Id.* at 1304–05. The forklift Leon was operating was substantially altered and equipped with non-Caterpillar parts. Caterpillar was not aware that the deadman's switch would be joined to a seat other than its own; in fact, it had no knowledge that its seats would be replaced at all, and is thus not responsible to ensure that its competitor's seats would not harden and compress in the furnace building merely because its representatives had knowledge that the forklifts would be operat-

ed in an area of extreme heat, a steel mill. Furthermore, the forklift involved in the accident was only six months old and it seems quite unreasonable to ask us to impute liability to a manufacturer who would have had no cause to foresee that a seat, whose composition they have no information (knowledge) about, would deteriorate in that short span of time, even assuming that they had knowledge that it was going to be installed.

The plaintiff's next attempt to impose liability upon Caterpillar is grounded in caselaw from jurisdictions other than Indiana, *Caporale v. Raleigh Industries of America,* 382 So.2d 849 (Fla.App.1980); *Sabloff v. Yamaha Motor Co.,* 113 N.J.Super. 279, 273 A.2d 606 (App.Div.), *aff'd,* 59 N.J. 365, 283 A.2d 321 (1971); *Vandermark v. Ford Motor Co.,* 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964); *Alvarez v. Felker Manufacturing,* 230 Cal.App.2d 987, 41 Cal.Rptr. 514 (1964), and Comments from the Restatement of Torts (Second) § 402A.

We will not engage in a lengthy discussion of each of the cases cited by the plaintiff for they are readily distinguishable from *Leon v. Caterpillar.* In each of these cases, the manufacturer sent the product to the dealer in an unfinished state. The dealer had to finish assembly of a bicycle in *Caporale,* a motorcycle in *Yamaha,* a car in *Vandermark,* and a concrete cutting machine in *Alvarez.* The reviewing courts found that because the manufacturer delegated the duty of completing the product to the dealer, the manufacturer would be held liable for any errors on the part of the dealer because faulty assemblies were reasonably foreseeable. *Caporale,* 382 So.2d at 850; *Sabloff,* 273 A.2d at 612; *Vandermark,* 391 P.2d at 170; *Alvarez,* 41 Cal. Rptr. at 519. In the case at hand, Caterpillar delivered a fully assembled product to Calumet and Leon's attempt to persuade us with law from jurisdictions other than Indiana, and with factual situations dissimilar to the instant case, is less than persuasive.[16]

Leon also relies on the Restatement (Second) of Torts § 402A, Comments "p" and "q" for the proposition, as stated in his appellate brief, that "a manufacturer may remain strictly liable for the defective condition of one of its products even when the defect does not exist until after the product leaves the manufacturer and is handed down to a dealer who performs some tasks concerning the product prior to its sale or delivery to the ultimate user." Comment p. to § 402A states that "the mere fact that the product is to undergo processing, or substantial change, will not in all cases relieve the seller of liability," and Comment q. posits that "where there is no change in [a defective] component part itself, [that a dealer will] merely incorporate[ ] into something larger, the strict liability will be found to carry through to the ultimate user or consumer." However, the Comments are premised upon § 402A(1)'s requirement that strict liability is imposed on a seller only when a product is sold "in a defective condition unreasonably dangerous to the user or consumer." We disagree that the comments are applicable to the case at hand, for it is undisputed that the forklift was not in a defective or in an unreasonably dangerous condition when it left Caterpillar, and Caterpillar had no knowledge that the deadman's switch would be joined to a seat other than the one it had installed on the forklift truck before it left the factory.

■ Leon's final position is that a manufacturer who is aware that alterations will be made to its products, should be held to a nondelegable duty to ensure that the modifications are done in a "reasonably safe" manner, and that if we hold that Caterpillar is not strictly liable for Aloia's alterations, we will allow manufacturers to "thwart the underlying goals of product's liability simply by delegating certain tasks ... to the dealer." Additionally, Leon argues that by holding the manufacturer strictly liable for alterations, plaintiffs will be relieved of the task of having to sue component part manufacturers such as Hyster. The flaw in Leon's final

16. We note that the District of Columbia Circuit also held that *Caporale* was grounded in the Florida appellate court's finding that "the manufacturer knowingly relied on the retailer to assemble its bicycles." *Hull,* 825 F.2d at 458. The court went on to hold that because Eaton fully assembled its forklift before delivery to the dealer, Eaton was not strictly liable for any additional changes made to the forklift by the dealer. *Id.*

contention is that Caterpillar participated in neither the design nor the installation of the switch nor did it delegate this task to the dealer, for it delivered the assembled forklift unit complete and functional to Calumet. *Cf. Hull*, 825 F.2d at 458; *Caporale*, 382 So.2d at 850; *Sabloff*, 273 A.2d at 612; *Vandermark*, 391 P.2d at 170; and *Alvarez*, 41 Cal.Rptr. at 519. We refuse to be a party to the extension of strict products liability to such an unreasonable degree, especially when Leon is trying to avoid the reality that if the deadman's switch was, in fact, defective, he should have brought his claim against Aloia and Calumet, and not Caterpillar.

The district court's directed verdict on the issue of strict liability for the deadman's switch was proper because from our review of the evidence, in the light most favorable to Leon, we conclude that there was a void in the quantum of evidence required to support a verdict in his favor. *Mayer*, 29 F.3d at 335.

### C. JURY INSTRUCTION

#### 1. *Standard of Review*

 The parties do not contest the applicable standard of review: Indiana courts have stated that "the giving of jury instructions is a duty entrusted to the discretion of the court and the trial court's decision will not be disturbed except where there is an abuse of that discretion," *Morris v. K–Mart,*

*Inc.*, 621 N.E.2d 1147, 1148 (Ind.App. 5 Dist. 1993) (citation omitted), and "[i]n a diversity case, the validity of the jury instruction is determined by state law." *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1446 (7th Cir.1995). "The purpose of instructions is to guide the jury in the application of correct principles of law to the facts of the case before them." *Peak v. Campbell*, 578 N.E.2d 360, 361 (Ind. 1991) (citation omitted). "In reviewing a claim that evidence was insufficient to support the giving of an instruction, the appellate court may look only to that evidence most favorable to appellee and any reasonable inferences to be drawn therefrom. If there is any evidence to support the instruction, it was properly given." *Underly*, 605 N.E.2d 1186, 1191 (Ind.App. 4 Dist.1993); *see also McKain v. Bisson*, 12 F.3d 692 (7th Cir.1993) ("Under Indiana law, an instruction is justified if there is any evidence to support it").

#### 2. *Analysis*

 Leon argues the district court erred in instructing the jury on product misuse,[17] and when it refused to read the jurors his proposed jury instruction Number 21.[18] Under Indiana law, unforeseeable misuse of a product is a complete defense to product liability. *Underly*, 605 N.E.2d at 1189; *see also Estrada v. Schmutz Mfg. Co., Inc.*, 734 F.2d 1218, 1221 (7th Cir.1984); Ind.Code § 33–1–1.5–4(b)(2).[19] Leon contends that the

---

**17.** The allegedly objectionable portion of the district court's instruction to the jury on misuse read as follows:

(b) With respect to any products liability action based on strict liability in tort:

\* \* \* \* \* \*

(2) It is a defense that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party. Where physical harm to the claimant is caused jointly by a defect in the product which made it unreasonably dangerous when it left the seller's hands and by the misuse of the product by a person other than the claimant, then the conduct of that other person does not bar recovery by the claimant for the physical harm, but shall bar any right of that other person, either as a claimant or as a lienholder, to recover from the seller on a theory of strict liability.

**18.** Plaintiff's tendered jury instruction number 21 reads as follows:

You have heard the term "misuse of the defendant's product in an unforeseen manner" as an affirmative defense raised by Caterpillar Industrial, Inc. to this case. The Court has determined that there is no evidence in this case to establish such defense as a matter of law and you are instructed that you may not consider that subject matter in your deliberations.

**19.** The statute, in pertinent part, states:

(a) The defenses in this section are defenses to actions in strict liability in tort. The burden of proof of any defense raised in a product liability action is on the party raising the defense. (b) With respect to any product liability action based on strict liability in tort:

(2) It is a defense that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller

jury should have been instructed that, as a matter of law, there was no evidence of product misuse, because one of Caterpillar's representatives, Martin Robinson, testified that Leon was using the forklift for an intended and appropriate purpose at the time of the accident, *i.e.*, emptying the spark box.

Although Indiana's products liability statute does not define misuse, "it has a well recognized meaning in products liability law. It means to use a product in a way in which it was not intended to be used." *Traylor v. Husqvarna Motor,* 988 F.2d 729, 734–35 (7th Cir.1993); *see also Jarrell v. Monsanto Co.,* 528 N.E.2d 1158 (Ind.App. 2 Dist.1988), *trans. den.,* 555 N.E.2d 453 (Ind.1990) ("Misuse is use for a purpose or in a manner not reasonably foreseeable"). "[T]he key to a successful claim of misuse is whether the seller can prove that the misuse, *from the seller's perspective,* was not reasonably foreseeable. The foreseeability of an intervening misuse is usually a question for the jury." *Underly,* 605 N.E.2d at 1189 (emphasis added, citations omitted).

At trial, there was ample evidence to establish that the forklift truck was misused. First and foremost, Leon denied knowledge of the fact that his forklift was equipped with a deadman's switch, yet the thirteen hour Inland safety training program, which the plaintiff admitted not only participating in but successfully completing, instructed all operators about the switch and its presence on the vehicle, and informed each of the trainees that they were to inspect the deadman switch on the forklift before starting each shift and indicate on a form for the operator's daily inspection report of the forklift whether or not it was in working order.[20] Furthermore, Leon had been operating a unit at Inland for over three and one-half years, and should have been fully aware of all the safety requirements he was to follow. Tom Newton, Inland's engineer, testified that on the night of the accident, there was no entry made on Leon's equipment report sheet indicating that the unit was not operational.

Leon's trial testimony also established that he failed to properly inspect the parking brake on his forklift before beginning his shift, as required in Inland's safety regulations. Leon testified that because the parking brake light was on and the brake pedal remained down when depressed, he thought the brake was working.[21] However, the procedure required for checking the brake was to depress the pedal and accelerate slightly to see if the forklift moved, which Leon should have known from his training course and his three-and-one-half years of experience operating similar vehicles. Had Leon followed the proper regimen for inspecting the parking brake, he would have discovered that it was out of adjustment, and if he had inspected the deadman's switch, as required, he would have found that it too was malfunctioning. If Leon had correctly inspected either device, he would then have been required to "red-tag" the forklift for repairs, and as his supervisor testified, another forklift unit would have been assigned to him for the evening shift.

---

sold or otherwise conveyed the product to another party[.]
Ind.Code § 33–1–1.5–4(b)(2) (Burns 1992).

**20.** The Inland safety manual reiterates the operator's duty to make a careful inspection of each unit before beginning work, and states that defects should be noted on the inspection form, and reported to the operator's foreman at once if there is a malfunction.

**21.** James Bradley, the Inland manager who was in charge of the accident site building and all of the machinery therein, conducted some tests on the parking brake with the forklift in gear. His tests revealed that the brake was out of adjustment and would not hold when the lift even was

at idle. Also when Aloia, the owner of Calumet, inspected the underside of the forklift, he discovered that there was a space between the brake pads and the disc, which should have been touching, rendering the brake non-functional. Caterpillar's expert witness, James Bauer, a product design engineer who owns an engineering firm in Richland, Michigan, opined that the combination of the 2% slope of the floor on which the forklift was resting while Leon closed the doors of the spark box, in combination with the vibrations from the operation of the furnace, provided enough force to place the forklift in motion. Leon's expert witness, George Bingley, agreed that the slope and vibrations could set the neutral forklift in motion if the parking brake was inoperative.

Additionally, the Inland safety manual,[22] in accordance with ANSI and OSHA regulations, mandates that "[m]obile equipment is not be left unattended unless *ignition is turned off,* shift lever is in neutral position, parking brake is set, *and on lift trucks, the forks are on the floor.*" (Emphasis added). When Leon was closing the spark box, he left the unit running, in spite of his acknowledgement that he was aware of the safety rule requiring him to shut off the ignition.

Leon also admitted that he did not lower the forks to the ground before he dismounted the forklift in order to save time, in violation of his safety rules and training, as well as the Caterpillar instruction manual and operating film for the proper and safe operation of the forklift unit, and the evidence is uncontroverted that it would have taken him but one or two seconds to do so. Had Leon lowered the forks to the ground, the forklift would have been braked independent of the deadman's device, and thus would have been unable to move forward whether or not the unit was in gear. Leon admitted that he was trained in this safety procedure, yet failed to heed it. Both Bradley and Bingley, Leon's expert witnesses, testified that when they tested the forklift trucks with the forks lowered to the ground level, it did not move unless they placed all their weight on the accelerator by standing on it.

Notwithstanding the evidence in the record of four independent safety violations, Leon maintains that Caterpillar "was familiar with Inland's actual practices and therefore Leon's (as well as all the other forklift operators') [negligent and careless] conduct was completely foreseeable." Leon provides us with no reference in the record to support his assertion of Caterpillar's knowledge of product misuse and "we refuse to search and comb the record in search of" such evidence. *United States v. Adamo,* 882 F.2d 1218, 1230 (7th Cir.1989) (citation omitted).

 It is true that "[i]f the producer knows that his product is being widely misused, he may have a duty to make reasonable efforts to warn against the consequences of

the misuses. This ... is consistent with the statute's confinement of the defense to cases in which the misuse is 'not reasonably expected by the seller at the time of the sale[.]'" *Traylor,* 988 F.2d at 735. Thus, we must determine if Leon's commission of the four safety violations constitute a "reasonably expectable use" of the forklift such that Caterpillar should have foreseen them.

Reasonably expectable use like reasonable care involves questions concerning the ordinary prudent person, or in the case of products liability the ordinary prudent consumer. The manner of use required to establish 'reasonably expectable use' under the circumstances of each case is a matter peculiarly within the province of the jury. The test of reasonably expectable use centers on the manner of use which an ordinary prudent consumer would employ under same or similar circumstances. In applying the test, it is not what the fact finder would have done as an individual, or in the case of a jury, even collectively. Rather, it is a matter of what the fact finder determines the abstract, reasonable prudent consumer, would have done under the circumstances.

*Short by Southerland v. Estwing Mfg.,* 634 N.E.2d 798, 801 (Ind.App. 5 Dist.1994).

James Bradley, the manager of the steel making process and the machinery used in the furnace building, testified that as a general rule, furnace helpers did not shut off diesel equipment, such as the forklift trucks, if they were to be used immediately thereafter, within "the next few seconds or minutes or even hours because of the problem restarting diesel equipment." Thus, it is conceivable that Caterpillar might have foreseen that Inland employees might not always disengage the ignition of forklift units when they were left unattended, if the difficulty in restarting diesel trucks was commonly known. However, it strains the limits of credulity for Leon to assert that Caterpillar should have reasonably expected one to fail to comply with *four independent safety regulations,*[23] when, as argued by Caterpillar, if

---

22. The safety manual is printed in English and Spanish. Leon's native language is Spanish.

23. The four violations consisted of failing to inspect the parking brake and deadman's switch before operation and failing to note on the in-

Leon had followed any one of the precautions listed above, he would not have been injured. We refuse to hold Caterpillar to a standard of liability that results in it being held responsible for the kind of gross carelessness and disregard for the safety rules and regulations exhibited by Leon.

Our holding that there was sufficient evidence of product misuse to support a jury instruction and finding on the issue also finds support in this court's holding that a person who disregards manufacturer safety devices raises an issue of misuse and, further, that evidence of such is sufficient to justify an inference of misuse. *See Downey v. Moore's Time–Saving Equipment, Inc.,* 432 F.2d 1088, 1093 (7th Cir.1970) (interpreting Indiana's strict liability law predating current strict product liability statute);[24] *see also Murphy v. Eaton, Yale & Towne, Inc.,* 444 F.2d 317, 328 (6th Cir.1971) ("misuse would consist of operating the [forklift] ... in a negligent or careless manner, or operating the [forklift] in violation of instructions issued by [the manufacturer] of which instructions plaintiff had knowledge"); *Nelson v. Caterpillar Tractor Co.,* 694 P.2d 867, 869 (Colo.App.1984) (misuse defense "is applicable where the plaintiff is injured as a result of disregarding the manufacturer's instructions").

■ Lastly, we discuss the issue of whether it was an abuse of discretion for the district judge to refuse to instruct the jury that there was no evidence of misuse of the forklift by Leon. A party is entitled to have his tendered instruction read to the jury only if the instruction is, first and foremost, supported by the evidence received at trial, and if: the instruction correctly states the law; it does not repeat material covered by other instructions; and the substantial rights of the party offering the instruction would be prejudiced if it were not given. *Underly,* 605 N.E.2d at 1191; *see also Superbird Farms, Inc. v. Perdue Farms, Inc.,* 970 F.2d 238, 244 (7th Cir.1992) ("the trial court must give an instruction if the instruction is supported by

the evidence"). "[P]rovided that the ... requirements [above] are met, a trial court should not refuse an instruction covering the law applicable to the case." *Peak,* 578 N.E.2d at 362.

As we held, there was more than sufficient evidence to support a jury instruction on product misuse. Thus, it follows that the evidence did not support an instruction to the jury that there was no evidence of product misuse. Leon's sole evidence of proper use is the testimony of Martin Robinson, a Caterpillar representative, who testified that removing the spark box from the blasting furnace, emptying and replacing the container, were proper uses for the forklift. But Leon's argument is misguided because Robinson only testified that the *general* purpose for which Leon was using the forklift was proper. He never testified that Leon conducted himself in a proper *manner* for this proper purpose. Thus, the district judge committed no abuse of discretion when he refused Leon's tendered instruction Number 9 because it was not supported by the evidence.

A FFIRMED.

---

spection form that they were inoperable. Neglecting to lower the forklift to the ground before dismounting and failing to turn off the ignition switch while the vehicle was left unattended.

**24.** *See, supra,* note 15.