In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3242

AMERICAN COMMERCIAL LINES, LLC,

*Plaintiff-Appellant,*

*v.*

THE LUBRIZOL CORP.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 12 C 135 — **Sarah Evans Barker**, *Judge.*

ARGUED FEBRUARY 26, 2016 — DECIDED MARCH 25, 2016

Before POSNER, FLAUM, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge*. The plaintiff and appellant in this commercial suit, American Commercial Lines (ACL), manufactures and operates tow boats and barges that ply the nation's inland waterways. The defendant, Lubrizol, manufactures industrial lubricants and additives, including a diesel-fuel additive that it calls LZ8411A. A company named VCS Chemical Corp. distributed the additive, and Lubrizol and VCS jointly persuaded ACL to buy it from VCS. Before de-

livery began, however, Lubrizol terminated VCS as a distributor because of suspicion that it was engaging in unethical conduct—one of Lubrizol's employees had failed to disclose to his employer that he was also a principal of VCS. But Lubrizol did not inform ACL that VCS was no longer its distributor.

No longer able to supply ACL with LZ8411A, VCS substituted an additive that ACL contends is inferior to LZ8411A. At least some of this other additive (which both Lubrizol and ACL call the "Counterfeit Additive") was produced by Afton Chemical Corp. VCS didn't inform ACL of the substitution. According to ACL's complaint, Lubrizol learned of the substitution too but also didn't inform ACL, which when it discovered the substitution brought the present suit—a diversity suit alleging a variety of violations of Indiana common law—against VCS, VCS's principal owner (who is also its CEO), and Lubrizol. ACL settled with VCS and its owner, leaving Lubrizol as the only defendant. The district judge dismissed part of the remaining suit on Lubrizol's motion to dismiss and the rest on its motion for summary judgment.

VCS is a small company, which is probably why ACL wasn't content with the size of the settlement with it and so has persisted in suing Lubrizol, making multiple claims. One is that VCS was an agent, and alternatively an apparent agent, of Lubrizol, see *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675–77 (Ind. 2001); *Leon v. Caterpillar Industrial, Inc.*, 69 F.3d 1326, 1336–37 (7th Cir. 1995) (Indiana law), and so VCS's substitution of the inferior additive should be imputed to Lubrizol as VCS's principal, making Lubrizol liable for VCS's fraud and breach of contract. ACL further argues that

Lubrizol had, and broke, a contract with VCS to supply LZ8411A to ACL, and that ACL was a third-party beneficiary of the contract. Another claim is that Lubrizol had a quasi-contract with ACL stemming from earlier work the two firms had done jointly in testing the quality of the LZ8411A additive and its suitability for ACL's needs. Still another charge made in the complaint is that Lubrizol was guilty of constructive fraud because it had breached a duty to notify ACL of the break with VCS and the substitution of the inferior additive, and alternatively that Lubrizol committed "civil deception" by not notifying ACL. But at least ACL has abandoned an absurd claim of tortious interference with contract; it had claimed that Lubrizol's decision to terminate VCS as a distributor of Lubrizol products and thus cause VCS to breach its contracts with ACL had been motivated by "disinterested malevolence" toward ACL, "meaning that … the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (New York law).

A manufacturer has no duty at common law to protect the customers of its distributors from misconduct by a distributor. ACL could have asked Lubrizol, which it knew to be VCS's supplier, for a contractual guaranty against VCS's failing to perform its contract with ACL. It didn't ask for a guaranty, apparently trusting VCS. ACL is not some helpless consumer, at the mercy of the companies it does business with; its estimated value in 2010 was $800 million. See Platinum Equity, "American Commercial Lines," www.platinumequity.com/american_commercial_lines (visited March 24, 2016). ACL argues that by helping VCS land the LZ8411A contract with it, Lubrizol became a de facto party to the con-

tract. But that would imply that a real estate agent who successfully brokers the sale of a house thereby becomes a seller of the house along with its client, the owner. It was natural for ACL, before deciding to buy LZ8411A from VCS, to consult the manufacturer of the additive (Lubrizol), who would be able to give more authoritative answers to questions about its quality and its suitability for use in ACL's tow boats than a distributor could give. That consultation did not create a contract between Lubrizol and ACL.

Although as the ultimate consumer ACL could expect to benefit from Lubrizol's sale of the additive to its distributor, that expectation did not make ACL a third-party beneficiary of the contract between VCS and Lubrizol. More was required. See, e.g., *Luhnow v. Horn*, 760 N.E.2d 621, 628–29 (Ind. App. 2001). Otherwise a consumer would be a third-party beneficiary of any sales contract between a supplier of a good and a distributor of the good to the consumer.

Nor was VCS, by virtue of being a distributor of Lubrizol's product, an agent of Lubrizol. "Every bar which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise." *Leon v. Caterpillar Industrial, Inc.*, *supra*, 69 F.3d at 1336. A distributor buys from his supplier and resells; an agent works on behalf of a principal and if he acts within the actual or apparent scope of the agency binds the principal. If you hire a real estate broker to sell your house, authorizing him to sell it for no less than a price you specify, and he complies with your directions, you are bound by the sale. Likewise if you said something to a prospective buyer of property from you that was likely to convince him that you had authorized a real estate broker to make the sale, you'd be bound even if you

hadn't actually intended to sell the property. It would be a case of "apparent agency"—you had created the appearance that the broker was your agent, and that made him your agent in the eyes of the law.

There is nothing like that in this case, any more than there was in *Leon v. Caterpillar Industrial, Inc.*, *supra*, 69 F.3d at 1333–37, which held that a manufacturer was not liable on grounds of either actual or apparent agency despite having actively promoted its distributor to the distributor's customers. The harm of which ACL complains began when VCS substituted the inferior additive, and no one suggests that by doing that VCS was benefiting Lubrizol or acting at its direction—Lubrizol had severed its relations with VCS. ACL claims that Lubrizol held VCS out as its agent, but apparent-agency claims turn on what the alleged principal told the third party, and ACL has disclosed no statement by Lubrizol to it that made VCS out to be more than a distributor.

Lubrizol's reluctance to inform ACL that it had broken relations with VCS and that VCS had made an unauthorized substitution of Afton's diesel-fuel additive for Lubrizol's is understandable. VCS would doubtless have responded to the information by suing Lubrizol, asserting that Afton's additive was just as good as Lubrizol's and that in any event Lubrizol had had no cause for breaking with VCS—that the charge that VCS was "unethical" was unfounded, and thus defamatory, and so Lubrizol had broken its contract with VCS rather than vice versa. In fact, attached to ACL's complaint as an exhibit is an email from Lubrizol's legal department expressing concern that Lubrizol might be sued by VCS should it discuss VCS with VCS's customers.

ACL argues that it had a "special relationship" with Lubrizol which bound the latter, at whatever cost in possible litigation with VCS, to inform ACL that VCS was supplying an inferior additive to it. The "special relationship" is alleged to give rise to a duty of "good faith and fair dealing," making Lubrizol's failure to inform ACL of the substitution "constructive fraud." By that is meant a fraud committed by silence rather than a statement, and thus it presupposes a duty to speak based on a fiduciary obligation, or assurances, *American Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247–49 (Ind. App. 2010), or a contract—all missing here. Had ACL wanted such protection it could have negotiated a contract with Lubrizol that would have obligated the latter to keep ACL apprised of Lubrizol's dealings with VCS. ACL argues that the complex nature of the product, a chemical additive, put Lubrizol as supplier in a position of superiority over it as buyer, and that Lubrizol had encouraged ACL to trust it during the earlier field test of the product. But as a sophisticated commercial entity ACL was well positioned to protect itself against a faithless supplier. It may not have asked Lubrizol for contractual protection against misfeasance by VCS only because it knew it would have a contractual or tort remedy if VCS defrauded it. Indeed it sought such a remedy by suing VCS, and obtained at least partial relief by settling.

A competent party—a big boy like ACL—should be required to exhaust its contractual remedies before invoking tort law and tort-like extensions of contract law. A well-drafted contract provides a cleaner basis for a legal remedy than does a nebulous body of jargony legal theories such as "special relationship," "constructive fraud," "duty of good

faith and fair dealing," "disinterested malevolence," and "quasi-contract."

A word finally about that last term, quasi-contract. ACL treats it as if it were synonymous with contract, whereas the term "quasi-contract" actually denotes absence of a contract, coupled with a sense that there would have been a contract had it not been for some unexpected intervening event. The classic example is the physician who chances on a person lying unconscious on the ground and treats him. Because the patient is unconscious there can be no contractual negotiation regarding the physician's price for the treatment. Yet it is customary for physicians to be paid for the medical services they render, and so the law treats the situation as if the parties had contracted for treatment at the physician's normal rate. In *Confold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 958 (7th Cir. 2006), we gave the example "of the physician who renders services to an unconscious person and later sends him a bill that the patient refuses to pay," and we pointed out that requiring the patient to pay "the normal fee for such a medical service … enforces reasonable expectations." This is called enforcing a "quasi-contract" because "the court is constructing a contractual relationship [ex post facto] in order to bring about the result for which the parties probably would have contracted had contracting been feasible in the circumstances, which it was not." *Id*. But there was no obstacle in this case to ACL's contracting with Lubrizol.

AFFIRMED